Frank E. Scherkenbach, SBN 142549 (scherkenbach@fr.com)
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

Karen I. Boyd, SBN 189808 (boyd@fr.com)
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Thomas S. McClenahan, SBN 203204 (mcclenahan@fr.com)
Michael J. Kane (*pro hac vice*) (michael.kane@fr.com)
William R. Woodford (*pro hac vice*) (woodford@fr.com)
Fish & Richardson P.C.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN  55402
Telephone:  (612) 335-5070
Facsimile:  (612) 288-9696

Attorneys for Defendant
KYPHON INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (SAN FRANCISCO DIVISION)

| | |
|---|---|
| MEDTRONIC, INC., MEDTRONIC VASCULAR, INC., MEDTRONIC USA, INC., MEDTRONIC VASCULAR GALWAY LTD., MEDTRONIC SOFAMOR DANEK, INC., and SDGI HOLDINGS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> KYPHON INC., <br><br> Defendant. | Civil Action No. C06-02559 SI <br><br> **KYPHON INC.'S MOTION FOR SANCTIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 11** <br><br> Date:    December 1, 2006 <br> Time:    9:00 a.m. <br> Judge:   Hon. Susan Illston |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that at 9:00 a.m. on December 1, 2006, or as soon thereafter as it may be heard, the Court will hear Defendant Kyphon Inc.'s motion for sanctions under Federal Rule of Civil Procedure 11 in the courtroom of the Honorable Susan Illston, Courtroom 10 of the United States District Court, Northern District of California, located at 450 Golden Gate Ave., San Francisco, California.

Defendant Kyphon Inc. moves for an order imposing sanctions on Plaintiffs Medtronic, Inc., Medtronic Vascular, Inc., Medtronic USA, Inc., Medtronic Vascular Galway Ltd., Medtronic Sofamor Danek, Inc., and SDGI Holdings, Inc. (collectively "Medtronic") and their counsel, Akin Gump Strauss Hauer and Feld LLP, for filing and maintaining the patent infringement claims in Count I of the Amended Complaint dated May 25, 2006 in violation of Federal Rule of Civil Procedure 11(c). Kyphon respectfully requests that the Court dismiss Count I of the Amended Complaint in its entirety and award Kyphon its attorney fees incurred in the defense of these claims, including the filing of this motion. Kyphon relies on the Memorandum in Support of this motion, the Declarations of William R. Woodford ("Woodford Decl.") and Arthur Ferdinand ("Ferdinand Decl.") submitted in support of this motion, as well as the pleadings and papers on file and any further evidence submitted to the Court.

KYPHON INC.'S MOTION FOR SANCTIONS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 11
Civil Action No. C06-02559 SI

## **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................... 1

II.    SUMMARY OF ARGUMENT ................................................................. 3

III.   BACKGROUND .................................................................................... 4

    A.    Kyphon Invented a Procedure and Line of Products that
         Transformed the Treatment of Vertebral Compression Fractures ......................... 4

    B.    Medtronic Filed This Case in Retaliation for Kyphon's Tennessee
         Suit Accusing Medtronic of Stealing Trade Secrets ............................... 6

    C.    Medtronic Refuses to Articulate Its Infringement Theory, Despite
         Repeated Requests by Kyphon and Its Obligation To Do So Under
         the Local Rules.................................................................................... 7

    D.    The Inventors Confirmed that Medtronic's Allegations Have No
         Basis ................................................................................................... 8

IV.   ARGUMENT ......................................................................................... 8

    A.    The Court Can Award Sanctions Under Rule 11 for the Filing of
         Baseless Patent Infringement Claims.................................................. 8

    B.    Medtronic's Infringement Allegations for the Saab Patent are
         Factually and Legally Baseless .......................................................... 9

         1.    The Saab patent covers a collapsible sleeve in addition to
              the balloon to improve the catheter's ability to navigate the
              vascular system ....................................................................... 9

         2.    Kyphon's IBTs cannot infringe because they do not have
              the required collapsible sleeve ................................................ 11

         3.    Even if the balloon could be considered the sleeve,
              Kyphon's IBTs still cannot infringe because the
              "collapsibility" limitation is not satisfied.............................. 12

    C.    Medtronic's Infringement Allegations for the Barbere Patents Are
         Baseless Because Kyphon's IBTs Lack the Required Attachment...................... 14

         1.    The Barbere patents both require an attachment between
              the catheter's inner and outer tubes near the distal end of
              the catheter ............................................................................. 14

         2.    During prosecution, Bard added the "proximal region" limitation to
              overcome prior art that had attachments at the Y-connector ................... 16

          3.    Kyphon's IBTs cannot infringe because they do not have an attachment
              located between the proximal region and distal end ................................ 18

KYPHON INC.'S MOTION FOR SANCTIONS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 11
Civil Action No. C06-02559 SI

**TABLE OF CONTENTS** *(Continued)*

D.   Medtronic's Infringement Claims for the Preissman Patent Are Baseless Because Kyphon Does Not Use Spherical Balloons of a Limited Diameter .................................................................................. 19

    1.   The Preissman patent discloses a specialized catheter with a braided reinforcement layer and has little, if anything, to do with balloons .......... 19

    2.   The Applicants amended their original claims to require a spherical balloon that inflates within a specified range ........................... 19

    3.   During prosecution, the Applicants relied heavily on the spherical shape and inflation diameter to overcome the prior art .............................................................................................. 20

    4.   Kyphon's balloons cannot literally infringe because they are not spherical and do not have a diameter from 4mm to 14 mm ............................................................................................... 21

    5.   Any attempt by Medtronic to invoke the doctrine of equivalents would be barred as a matter of law ........................ 23

E.   Medtronic and Its Counsel Should Be Sanctioned for Their Frivolous Infringement Claims ........................................................... 24

V.   CONCLUSION ........................................................................................ 25

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u> <u>Page</u>

3

*Antonious v. Spalding & Evenflo Cos.*
    275 F.3d 1066 (Fed. Cir. 2002)...................................................................... 8

4

*Bicon, Inc. v. Straumann Co.*
    441 F.3d 945 (Fed. Cir. 2006)...................................................................... 24

5

6

*Buster v. Greisen*
    104 F.3d 1186 (9th Cir. 1997)...................................................................... 8

7

*Christian v. Mattel, Inc.*
    286 F.3d 1118 (9th Cir. 2002)...................................................................... 8

8

9

*Cooter & Gell v. Hartmax Corp.*
    496 U.S. 384 (1990)...................................................................... 25

10

*Day Int'l, Inc. v. Reeves Bros., Inc.*
    260 F.3d 1343 (Fed. Cir. 2001).......................................................... 14, 24

11

12

*Desper Prods., Inc. v. QSound Labs., Inc.*
    157 F.3d 1325 (Fed. Cir. 1998).................................................................. 23

13

*Ekchian v. Home Depot, Inc.*
    104 F.3d 1299 (Fed. Cir. 1997).......................................................... 14, 19

14

15

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*
    344 F.3d 1359 (Fed. Cir. 2003).................................................................. 23

16

*Holgate v. Baldwin*
    425 F.3d 671 (9th Cir. 2005)...................................................................... 8

17

18

*Judin v. United States*
    110 F.3d 780 (Fed. Cir. 1997) .................................................................. 25

19

*Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.*
    66 F.3d 285 (Fed. Cir. 1995)...................................................................... 23

20

21

*Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*
    170 F.3d 1373 (Fed. Cir. 1999).................................................................. 24

22

*Q-Pharma, Inc. v. Andrew Jurgens Co.*
    360 F.3d 1295 (Fed. Cir. 2004) .................................................................. 9

23

24

*Southwall Techs., Inc. v. Cardinal IG Co.*
    54 F.3d 1570 (Fed. Cir. 1995)...................................................................... 14

25

*Springs Window Fashions LP v. Novo Indus., L.P.*
    323 F.3d 989 (Fed. Cir. 2003)...................................................................... 14

26

27

*Terlep v. Brinkmann Corp.*
    418 F.3d 1379, 1382 (Fed. Cir. 2005) .................................................................. 9

28

1

<u>**TABLE OF AUTHORITIES**</u> *(Continued)*

2

<u>Cases</u>                                                                                                     <u>Page</u>

3

*Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*
         988 F.2d 1165 (Fed. Cir. 1993)........................................................................ 12

4

*Tronzo v. Biomet, Inc.*

5

         156 F.3d 1154 (Fed. Cir. 1998)........................................................................ 24

6

*View Eng'g Inc. v. Robotic Vision Sys., Inc.*
         208 F.3d 981 (Fed. Cir. 2000)................................................................. 8, 9, 25

7

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*

8

         103 F.3d 1571 (Fed. Cir. 1997)........................................................................ 24

9

<u>**Other**</u>                                                                                                     <u>Page</u>

10

Fed. R. Civ. P. 11 ................................................................................................ 8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    INTRODUCTION

To enter the market for kyphoplasty, a spinal treatment that Kyphon pioneered and successfully developed, Medtronic misappropriated trade secrets of a well-respected surgeon, Dr. Harvinder Sandhu.  Late last year, Dr. Sandhu and Kyphon (Dr. Sandhu's licensee) sued Medtronic in Tennessee for this misappropriation.  Kyphon did not assert its own patents at that time because Medtronic—despite several months of false starts and empty promises—had not yet commercially launched its kyphoplasty product.

To avoid facing allegations of trade secret theft *and* patent infringement in the same case, several months before it planned to release its kyphoplasty product to the public, Medtronic filed this suit to keep Kyphon's patents out of the Tennessee action.  And to try to make its declaratory action on Kyphon's patents stick in this Court, Medtronic also felt the need to assert its own patents against Kyphon.  So Medtronic found three old C.R. Bard[1] patents it acquired years ago relating to catheters for balloon angioplasty and an equally-old patent it acquired from Dr. Gary Michelson relating to the shape of a device for cutting bone in a spinal fusion procedure.[2]

Any comparison of these patents to Kyphon's products plainly shows that no reasonable basis exists for Medtronic's infringement claims.  The catheter patents require several features for improving angioplasty procedures that are completely missing from Kyphon's accused Inflatable Bone Tamp products (IBTs).  Similarly, the relevant claims of the Michelson patent do not come close to covering Kyphon's bone-cutting device, and, in any event, the claims are plainly invalid in view of prior art that the Patent Office had cited to Medtronic during the prosecution of another patent in the Michelson portfolio before Medtronic filed this suit.

To be certain that it had not overlooked anything obvious, Kyphon contacted the inventors of the three Bard patents and asked them what they thought of Medtronic's allegations.  Their response was the same—they had no idea how Kyphon's products related to their inventions,

---

[1]    Medtronic acquired C.R. Bard in 1998.  Bard designed medical devices for balloon angioplasty, a procedure in which a balloon catheter is navigated through the body's vascular system to repair blockages in the blood vessels of the heart.

[2]    Spinal fusion is the process of rigidly joining together two separate vertebra.  This process has nothing to do with kyphoplasty, as explained in more detail below.

KYPHON INC.'S MOTION FOR SANCTIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 11
Civil Action No. C06-02559 SI

1   much less how the products could possibly infringe their patents.  Simply put, they had no idea

2   what Medtronic was thinking.

3          Kyphon assumed that, when presented with the facts, Medtronic would act reasonably and

4   drop its infringement claims.  To that end, within a month of Medtronic's filing, Kyphon sent a

5   long letter to Medtronic that detailed the problems with its allegations.  Medtronic refused to

6   respond to the substance of the letter and instead stated its intent to maintain its claims.  But a

7   week later, Medtronic all but admitted that it should never have asserted the Michelson patent by

8   dropping it from the suit—even though it made a point of touting this patent when it first

9   announced the lawsuit against Kyphon.  In place of this patent, Medtronic accused Kyphon's IBTs

10  of infringing yet another patent, acquired from yet another company, that claims a spherical

11  balloon having a specific diameter to block blood-flow through vessels in the body.

12         This new patent was no better than the others.  Because Medtronic's new infringement

13  claim was also off-base, Kyphon sent another letter that outlined, in great detail, the reasons why

14  the accused products could not infringe this new patent.  Again, Medtronic refused to respond to

15  the substance of the letter.

16         Kyphon then noticed the depositions of the Bard inventors and waited for Medtronic's

17  preliminary infringement contentions, to be sure the issues were fully framed before bringing them

18  to the Court.  Medtronic's infringement contentions were replete with vague and conclusory

19  allegations and confirmed that Medtronic had not performed a competent presuit analysis.  In fact,

20  many of Medtronic's contentions directly contradict arguments made during the prosecution of the

21  asserted patents.  The inventor depositions were even worse for Medtronic.  The inventors testified

22  that ████████████████████████████████████████████████████████████████

23  ████████████████████████████████   Medtronic's only counter to this testimony was ██

24  ███████████████████████████████████████████████████████████████

25         Enough is enough.  Patent infringement allegations are serious and defending an

26  infringement suit is enormously expensive and time-consuming.  Medtronic should not be allowed

27  to drag Kyphon through an infringement suit built on baseless allegations—much less when the

28  allegations are part of a larger litigation and business strategy to bully a smaller competitor, not a

KYPHON INC.'S MOTION FOR SANCTIONS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 11
Civil Action No. C06-02559 SI

1  legitimate attempt to protect intellectual property rights.  Kyphon recognizes that Rule 11 is often

2  inappropriately invoked.  This is the sort of case, however, for which Rule 11 was written.  When

3  the inventors insist that their patents have no application to the accused products, an acquirer of

4  these patents (Medtronic here) has no basis to argue otherwise.

5  **II.      SUMMARY OF ARGUMENT**

6       Balloon catheters are well-known in the art and were around well before any of the patents

7  asserted here.  Hence, the Medtronic patents do not cover ground-breaking technology—they are

8  directed to specific structural features aimed to improve the performance of catheters for

9  angioplasty or other procedures inside the body's vascular system.  Kyphon's IBTs were designed

10  for an entirely different purpose (to treat spinal fractures) and neither need nor have any of the

11  claimed features.  Medtronic's infringement claims are objectively baseless.

12       For example, Patent No. 4,820,349 issued to Mark Saab ("the Saab patent") is directed to

13  an angioplasty catheter designed to reduce the "profile" of the catheter's distal (far) end so that it

14  may be more easily navigated through blood vessels.  To achieve this goal, Saab replaced the

15  relatively rigid shaft at the distal end of prior art catheters with a sleeve that, like the balloon, can

16  collapse under negative pressure.  The Saab patent claims require that "both the sleeve and

17  balloon" be inflatable, deflatable, and collapsible.  Kyphon's products do not have the required

18  sleeve—like the prior art, they only have a relatively rigid shaft and a balloon.  Because no sleeve

19  exists, Medtronic simply points an arrow at the balloon in its infringement contentions and claims

20  it is the sleeve.  This theory ignores the plain language of the claims, the specification, and the

21  prosecution history and, therefore, cannot reasonably support an infringement claim.

22       The two other Bard patents issued to Barbere (Nos. 5,759,191 and 6,179,856, "the Barbere

23  '191 and '856 patents") also disclose an improvement to angioplasty catheters.  Prior art catheters

24  constructed with inner and outer concentric tubes typically had two connections between the

25  tubes—one at the extreme proximal (near) end of the catheter (at the Y-connector) and one at the

26  extreme distal end.  But the distal ends of these catheters were susceptible to "buckling" or

27  "telescoping" because the two tubes would move independently of each other when pushed

28  through a blockage in an artery.  Barbere sought to improve these catheters by adding a third

1    attachment between the inner and outer tubes located near the catheter's distal end.  Like the prior

2    art, Kyphon's IBTs only have two attachments between the inner and outer tubes—one at the

3    extreme proximal end and another at the extreme distal end.  Again, because no third attachment

4    exists, Medtronic claims the connection at the extreme proximal end (Kyphon's Y-connector)

5    satisfies the claim limitations.  Medtronic's view of the Barbere patents is entirely unsupportable.

6         Likewise, the patent Medtronic recently added to this suit (Patent No. 5,759,173 issued to

7    Preissman et al., ("the Preissman patent")) claims a catheter with a "spherical" balloon that inflates

8    within a diameter range of 4 mm and 14 mm to stop blood flow through an artery with minimal

9    "mechanical" disruption of the arterial wall.  These limitations were added to the claims during

10   prosecution and relied on to secure issuance of the patent.  The balloons on Kyphon's IBTs are

11   specifically designed to be non-spherical and expand beyond the claimed range.  The non-

12   spherical shape maximizes the surface contact with the vertebral bone to provide the maximum

13   mechanical disruption possible.  Because Medtronic ignores the "spherical" and "diameter"

14   limitations its allegations regarding the Preissman patent are also baseless.

15        The differences in both structure and use between Kyphon's IBTs and the devices covered

16   by Medtronic's patents are plain to everyone, and should have been easily understood by

17   Medtronic and its counsel before launching this suit.  Moreover, a reasonable and competent

18   review of the intrinsic record—especially the prosecution history—would have plainly

19   demonstrated that Kyphon could not infringe any of the asserted patents.  Thus, Kyphon asks that

20   the Court dismiss Medtronic's infringement claims with prejudice and grant Kyphon attorney fees

21   for having to defend against them.

22   **III.    BACKGROUND**

23        **A.    Kyphon Invented a Procedure and Line of Products that Transformed the
              Treatment of Vertebral Compression Fractures.**

24

25        Kyphoplasty is a new procedure invented by Kyphon's founders to treat compression

26   fractures of the spine typically experienced by elderly victims of osteoporosis.  Before

27   kyphoplasty, patients suffering from spinal deformities caused by vertebral fractures, such as the

28   "dowager's hump," had few options for treatment.  They were typically given a combination of

1   pain medication and bed rest, neither of which addressed the vertebral fractures. Alternatively,

2   they were treated by injecting bone cement into the broken vertebra under high pressure, which

3   locked the broken bones in their place without repairing the spinal deformity.

4        Unlike these treatment options, kyphoplasty repairs vertebral fractures by returning the

5   spine to its pre-fractured state. At the most basic level, a typical kyphoplasty procedure performed

6   with Kyphon's balloon products involves creating a pathway into a crushed or fractured vertebra,

7   guiding a small orthopaedic balloon (called an inflatable bone tamp or "IBT") through the

8   pathway into the vertebra, expanding the IBT to move the fractured bone back to its pre-fractured

9   state (which at the same time creates a cavity inside the vertebra), deflating and removing the IBT

10  from the vertebra, and finally filling the cavity with bone cement to stabilize the fracture. The

11  series of pictures below illustrate the basic steps of kyphoplasty:



**STEP 1**      **STEP 2**      **STEP 3**      **STEP 4**

17       Since inventing kyphoplasty, Kyphon has continued to refine the procedure. In the past

18  decade, Kyphon also developed, patented, and commercialized numerous devices to provide a

19  complete system for the treatment of a fractured vertebral body with kyphoplasty, including

20  multiple varieties of IBTs designed to serve different purposes inside fractured vertebrae. Since

21  receiving FDA clearance in 1998, Kyphon's products have been used to treat almost 300,000

22  fractured backs worldwide, which represents but a small part of the population that could benefit

23  from Kyphon's products and its revolutionary procedure. Kyphon's life-blood is the revenue

24  derived from its kyphoplasty products, with well over 99 percent of its revenues still dependent on

25  this single line of business.

26       Medtronic accuses three of Kyphon's KyphX Xpander® IBTs and one of its KyphX®

27  Express™ IBTs of infringing the four asserted patents. A picture of an IBT is shown below:

28

KYPHON INC.'S MOTION FOR SANCTIONS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 11
Civil Action No. C06-02559 SI

1

2



3   All three accused KyphX Xpander® IBTs are identical in structure and vary only in the uninflated

4   length of the balloon at the device's distal end (uninflated lengths of 10 mm, 15 mm, and 20 mm).

5   The accused KyphX® Express™ IBTs are smaller versions of the Xpander® IBTs designed to

6   access the vertebra through a smaller aperture.  They have the same structural configuration as the

7   Xpander® IBTs and have two different sized balloons (10 mm and 15 mm).  Medtronic has

8   accused only the 10 mm size of infringement.

9

10

   **B.    Medtronic Filed This Case in Retaliation for Kyphon's Tennessee Suit
          Accusing Medtronic of Stealing Trade Secrets.**

11          After seeing the large number of patients being treated with Kyphon's products, several

12   years ago Medtronic announced its intention to enter the market with a competing product.  But as

13   Medtronic disclosed the details of its new product, it became apparent that Medtronic did not have

14   the right to this "new" technology.  In addition to the problems posed by Kyphon's substantial

15   patent portfolio, Medtronic derived its product from an alleged improvement to the basic

16   kyphoplasty procedure conceived by Dr. Sandhu, who, in 1999, disclosed this idea to Medtronic in

17   confidence.  Years later, without Dr. Sandhu's knowledge or permission, Medtronic patented his

18   inventions as its own and used them as the basis for its kyphoplasty product.

19          Kyphon and Dr. Sandhu subsequently entered into a license agreement and, in November

20   2005, together they sued Medtronic in Tennessee, alleging trade secret theft and unauthorized

21   patenting of Dr. Sandhu's inventions.  In apparent retaliation for the Tennessee action, Medtronic

22   filed this suit in April 2006.[3]  Medtronic was quick to publicize this suit, especially the assertion of

23   the Michelson patent: "The suit claims Kyphon is and has been directly and indirectly infringing

24   on a minimum of four patents related to balloon dilatation catheters and spinal treatment …

25   including U.S. Patent No. 6,096,038.  Medtronic acquired the '038 patent from Gary K.

26   Michelson, M.D."  (Woodford Decl. Ex. J.)  Anticipating the challenge Medtronic is now facing,

27

28   _____
     [3]   Medtronic also sought a declaratory judgment that its product did not infringe five of
     Kyphon's patents.  Kyphon moved to dismiss these claims for lack of subject matter jurisdiction.

1    Medtronic's press release also included the self-serving claim that it performed a "thoughtful and

2    comprehensive review" of the asserted patents.  (*Id.*)

3          **C.      Medtronic Refuses to Articulate Its Infringement Theory, Despite Repeated**

4                  **Requests by Kyphon and Its Obligation To Do So Under the Local Rules.**

5          Less than a month after Medtronic filed its Complaint, Kyphon sent the first of two letters

6    to Medtronic's counsel.  The first letter explained, in great detail, why the accused IBTs could not

7    possibly infringe the then-asserted patents and why the only relevant claim of the Michelson

8    patent was invalid.  (*See* Ex. K.)  Given the impact of Medtronic's infringement claims on

9    Kyphon's business, Kyphon also informed Medtronic that it would seek sanctions if Medtronic

10   did not withdraw the infringement claims with prejudice.  (*Id.* at 4.)  Medtronic dismissed the first

11   letter and said that it "stands by the statements made in its April 13, 2006, complaint."  (*Id.* Ex. L.)

12         After Medtronic amended its complaint to switch patents—perhaps after realizing that its

13   "review" of these patents was neither thoughtful nor comprehensive—Kyphon's counsel sent

14   another letter to Medtronic.  As it did before, Kyphon provided a detailed explanation why

15   Medtronic's new infringement claim was baseless.  (*Id.* Ex. M.)  And again, without any

16   explanation, Medtronic stood by its allegations.  (*Id.* Ex. N.)  In an effort to appear reasonable,

17   Medtronic's counsel invited a further discussion of the issues raised in Kyphon's letters.  But

18   when Kyphon's counsel accepted, Medtronic's counsel refused to entertain any sort of discussion.

19   (*See* Ex. O.)

20         Medtronic's preliminary infringement contentions—which were served on July 28—do

21   nothing to address the issues Kyphon raised months ago.  These contentions are filled with

22   conclusory statements, vague allegations, and theories that fly in the face of the plain language of

23   the claims and unambiguous statements in the prosecution history.  Indeed, for many of the

24   limitations that are plainly lacking, Medtronic just restates the claim language and says "[t]hese

25   features read on this claim element literally or under the doctrine of equivalents" without any

26   further explanation.  (*E.g.*, Ex. I at 7-8, 12-14, 17-18, 22.)  These "contentions" only show that

27   Medtronic never had a basis for its infringement claims.

28

**D.      The Inventors Confirmed that Medtronic's Allegations Have No Basis.**

The depositions of inventors Mark Saab and Michael Barbere further confirm that

Kyphon's products cannot infringe.  Saab testified that ████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████ Saab concluded that ████████████████████████

████████████████████████████████ Months ago, during a meeting with

Medtronic's counsel, he told them that ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ Likewise, Barbere examined Kyphon's IBTs and concluded that

████████████████████████████████████████████████

## IV.     ARGUMENT

**A.      The Court Can Award Sanctions Under Rule 11 for the Filing of Baseless Patent Infringement Claims.**

Rule 11 imposes a duty on attorneys to perform a reasonable inquiry before filing suit and

certify (by signature) that the pleading is well grounded in fact, is legally tenable, and is not

presented for any improper purpose.  Fed. R. Civ. P. 11(b); *View Eng'g Inc. v. Robotic Vision

Sys., Inc.*, 208 F.3d 981, 984 (Fed. Cir. 2000).  When reviewing the imposition of Rule 11

sanctions, the Federal Circuit applies the law of the regional circuit.  *Antonious v. Spalding &

Evenflo Cos.*, 275 F.3d 1066, 1072 (Fed. Cir. 2002).  Under Ninth Circuit precedent, in situations

where allegations in the complaint are the primary focus of the Rule 11 motion, courts make two

inquiries: (1) whether the complaint is objectively baseless as either a legal or factual matter; and

(2) whether the attorney conducted a reasonable and competent inquiry before signing the

complaint.  *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002).  A filing that fails both

prongs is considered "frivolous" and is subject to sanctions.  *Holgate v. Baldwin*, 425 F.3d 671,

676 (9th Cir. 2005); *see also Buster v. Greisen*, 104 F.3d 1186, 1190 (9th Cir. 1997).

The Federal Circuit has explained that, in patent infringement cases, Rule 11 requires

"that an attorney interpret the pertinent claims of the patent in issue" and "compare the accused

device with the construed patent claims" before filing a complaint.  *Antonious,* 275 F.3d at 1072-

1    73; *View Eng'g*, 208 F.3d at 986 (explaining that Rule 11 requires a law firm to, "at a bare

2    minimum, apply the claims of each and every patent that is being brought into the lawsuit to an

3    accused device and conclude that there is a reasonable basis for a finding of infringement of at

4    least one claim of each patent so asserted").  When interpreting the claims, an attorney must, at a

5    minimum, review the claim language, the written description, and the prosecution history,

6    following "standard canons of claim construction" to reach an interpretation that is "reasonably

7    supported by the intrinsic record."  *See Q-Pharma, Inc. v. Andrew Jurgens Co.*, 360 F.3d 1295,

8    1301 (Fed. Cir. 2004) (finding an attorney's pre-filing claim construction was not frivolous where

9    the entire intrinsic record was reviewed and the claim interpretation was reasonably supported);

10   *see also Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005) ("Interpreting the

11   asserted claims entails a review of the intrinsic evidence, which consists of the claim language,

12   the written description, and the prosecution history.")  The failure to meet these requirements

13   "should ordinarily result in the district court expressing its broad discretion in favor of Rule 11

14   sanctions."  *See View Eng'g* , 208 F.3d at 986.

B.    **Medtronic's Infringement Allegations for the Saab Patent are Factually and Legally Baseless.**

1.    **The Saab patent requires a collapsible sleeve in addition to the balloon to improve the catheter's ability to navigate the vascular system.**

18   The Saab patent is directed to an improved dilatation catheter for use in an angioplasty



Fig. 3

19   procedure.  (Woodford Decl. Ex. A at column 1, lines 5-10

20   ("1:5-10"); *see also* 1:12-39.)  Referring to Saab Figure 3, in a

21   typical angioplasty procedure the dilatation catheter (10) is

22   inserted into the femoral artery in the thigh, advanced through

23   the aorta (42) and around the aortic arch (44), and then inserted

24   into to the coronary artery (50).  (*Id.* at 5:26-40.)  As Figure 3

25   demonstrates, an angioplasty catheter must be flexible and have a

26   profile small enough to navigate the body's blood vessels, yet be

27   strong enough to repair an arterial blockage.

28   The Saab patent sets out to provide an improved dilatation catheter that "exhibits a high

9

1  degree of trackability over a guidewire through tortuous blood vessels" and a "low profile for the

2  balloon as well as for the distal segment of the catheter." (*Id.* at Abstract, 1:40-60, 2:15-29, 3:22-

3  55.) To provide these advantages, the Saab patent discloses a catheter having a sleeve, in addition

4  to the collapsible balloon in the prior-art catheters, that extends over the distal end of the catheter.

5  Both the sleeve (24) and the balloon (28) have a thin wall that allows them to collapse and closely

6  conform around the distal shaft extension 16 (the inner tube):



*Fig. 2*

13  (*Id.*; *see also id.* at 4:45-56, 5:7-16.) The patent explains that the sleeve should be "sufficiently

14  long, so that even when the distal end of the catheter is extended as far as possible into the

15  coronary arterial tree, the transition region 15 remains inside of the guide catheter 40" (shown in

16  Figure 3), or about "10 to 15 centimeters long." (*Id.* at 5:48-54, 5:61-63.) Alternatively, the

17  sleeve can extend over the full length of the catheter. (*Id.* at 7:48-50.) The patent also specifies

18  the actual thickness of the material forming the integral sleeve and balloon so that the material

19  may be thin enough to collapse around the inner tube under negative pressure. (*Id.* at 5:65-6:2.)

20  In his recent deposition, Saab confirmed that the unique feature of his invention was the ability to

21  inflate and collapse the sleeve, just like the balloon. (*Id.* Ex. P at 32:2-20, 34:1-38:14, 43:6-13.)

22       These critical limitations are also found in independent claim 1 of the Saab patent, which is

23  the only independent claim asserted by Medtronic here. (*See id.* Ex. I at 2.) In relevant part,

24  Claim 1 recites a catheter comprising: (1) "a sleeve extending over a distal segment of the shaft"

25  with (2) "the proximal end of the sleeve being attached to the shaft" and (3) "the distal end of the

26  sleeve being attached to the distal end of the shaft." (*Id.* Ex. A at 8:34-57.) The claim also has

27  several key limitations directed to the sleeve, which require the balloon to be "integral" to the

28  sleeve and that both the sleeve and balloon be collapsible about the reduced diameter of the shaft:

KYPHON INC.'S MOTION FOR SANCTIONS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 11
Civil Action No. C06-02559 SI

the sleeve having an integral enlarged diameter balloon portion, both the balloon and the sleeve being formed from a thin walled, flexible material and being inflatable and deflatable, both the sleeve and balloon being collapsible about the shaft in response to a negative pressure applied to the inflation lumen,

whereby the diameter of the catheter in the region of the sleeve may be made to conform closely to the smaller reduced diameter of the distal segment of the shaft.

(*Id.*)

### 2. Kyphon's IBTs cannot infringe because they do not have the required collapsible sleeve.

Medtronic has accused the Xpander® IBTs and an Express™ IBT of infringing claim 1 of the Saab patent.[4]  (*Id.* Ex. I at 2, 6-10.)  Although there are several reasons why Kyphon's IBTs do not infringe any claim of the Saab patent, the most glaring is the fact that Kyphon's IBTs do not



have the sleeve required by the claims.  All of the accused IBTs have only a peanut-shaped balloon bonded to the outer tube, as shown in the diagram at left. (Ferdinand Decl. ¶ 5, Ex. A.)  This should come as no shock to Medtronic, since Kyphon's IBTs are inserted into bone through a straight (and relatively spacious) cannula and have no need for a sleeve to provide a reduced profile and increased trackability necessary to navigate blood vessels.

Likewise, it could not have been surprising to hear Saab himself testify that ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████  In fact, before his deposition, Saab

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

---

[4]   The notations 20/3, 15/3, and 10/3 for the KyphX Xpander® in Medtronic's infringement contentions refer to the balloon size of the IBT (i.e., 20 mm, 15 mm, and 10 mm, respectively). Likewise, the notation 10/2 for the KyphX® Express™ IBT refers to the balloon size of 10 mm. (Ferdinand Decl. ¶¶ 3-4.)

1

2

From its infringement contentions, Medtronic appears content to ignore the "sleeve" limitation entirely.  Medtronic contends that the *balloon* on Kyphon's IBTs satisfies the collapsible *sleeve* requirement.  (*Id.* Ex. I at 7-8, 10 (arrows [D], [F] and [G]).)  But the claim language itself clearly prohibits such a theory—it states that the sleeve and balloon, while integral, are distinct things.  For example, the claim states that "***both*** the balloon ***and*** the sleeve" must be formed from a thin-walled, flexible material and that "***both*** the sleeve ***and*** balloon [be] collapsible about the shaft."  (*Id.* Ex. A at 8:47-53.)  Medtronic cannot simply point to Kyphon's balloon and say that the balloon is also the sleeve—that would contradict the plain language of the claim.  *See Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (rejecting a patentee's claim construction argument because it would "read an express limitation out of the claims").  The patent specification confirms the plain meaning of the claim by showing the balloon and sleeve as two distinct things:  elements 24 and 28 in Figure 2, reproduced above.

If the plain language of the claim and specification were not enough, inventor Saab confirmed that the sleeve and the balloon are not the same thing.  (*Id.* Ex. P at 42:4-45:3.)  He testified that the phrase "sleeve and balloon" is never used to reference only a balloon.  (*Id.* at 96:15-97:20, 102:21-103:21.)

### 3. Even if the balloon could be considered the sleeve, Kyphon's IBTs still cannot infringe because the "collapsibility" limitation is not satisfied.

Under Rule 11, Medtronic was required to review the entire intrinsic record and reasonably construe the claims before bringing suit.  Medtronic's current contention that the balloon is the "sleeve" demonstrates that it failed to do so.  But even if Medtronic has its way and the claimed "sleeve"—the focus of the entire patent—need not be anything other than the balloon, Kyphon still would not infringe because its balloon cannot meet the collapsibility limitation of the claims.

During prosecution, Bard relied heavily on the collapsibility of the sleeve to distinguish the prior art.  The patent examiner rejected the pending claims as being "clearly anticipated" by a catheter disclosed in a prior art patent issued to Pope et al., shown below:

KYPHON INC.'S MOTION FOR SANCTIONS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 11
Civil Action No. C06-02559 SI



(*Id.* Ex. B at MEDC000040-41; Ex. R (Pope reference).)  In response, Bard first reiterated that each claim required a collapsible sleeve that conformed closely to the inner tube and explained that Saab's configuration provided greater tracking ability as well as less obstruction to the artery when deflated.  (*Id.* Ex. B at MEDC000070.)  Then Bard distinguished Pope by arguing that it did not disclose the claimed collapsible sleeve:  "There is no disclosure or suggestion at all in Pope that the tubular catheter 12 (which the examiner presumably equated with applicant's claimed sleeve) might or should be collapsible about the guidewire 16."  (*Id.* at MEDC000071.)  Bard based its argument on the thickness of the sleeve identified by the examiner in the Pope patent—it was nearly *ten times* thicker than the sleeve disclosed in Saab's patent (0.0045" vs. 0.0005"):

> Moreover, it is apparent from the Pope '378 patent that the thickness of the tube
> 12 is very substantial.  [The Pope patent discloses] the inner and outer diameters
> of the tubular catheter 12 from which it may be determined that the wall thickness
> of the tube 12 is 0.0045".  Such a catheter would not collapse in the manner of
> applicant's invention.  Note, by comparison, that the wall thickness of the sleeve
> in applicant's invention is of the order of 0.0005".  Applicant's sleeve is of the
> order of one-tenth the thickness of that described in Pope.  The Pope device
> cannot provide the advantages of applicant's invention and clearly does not
> disclose or suggest applicant's claimed structure.

(*Id.*)  Based on this thickness argument, the examiner agreed that the Pope sleeve was not collapsible, withdrew the rejections, and allowed the claims.

If Pope's "sleeve" did not satisfy the collapsibility requirement of the Saab claims, then Kyphon's balloon cannot either.  All the balloons on the accused IBTs have a thickness of at least 0.0068 inches at their thinnest point.  (Ferdinand Decl. ¶ 12.)  The balloons only get thicker as they near the ends that are bonded to the inner and outer tubes.  (*Id.*)  Therefore, any part of the balloon that Medtronic attempts to call the "sleeve" is *more than 50% thicker* than the Pope "sleeve" that Bard argued was too thick to be collapsible.

Having distinguished the prior art based on wall thickness to get the asserted claims

allowed, Medtronic cannot reasonably contend that Kyphon's IBTs fall within the scope of those claims, either literally or under the doctrine of equivalents. *See Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection."); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."); *see also Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) (affirming summary judgment of noninfringement and explaining that "[a] patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement"); *Day Int'l, Inc. v. Reeves Bros., Inc.*, 260 F.3d 1343, 1348-50 (Fed. Cir. 2001) (affirming summary judgment of no literal infringement and no infringement under the doctrine of equivalents based on statements in the prosecution disavowing prior art temperature ranges).

### C.   Medtronic's Infringement Allegations for the Barbere Patents Are Baseless Because Kyphon's IBTs Lack the Required Third Attachment.

#### 1.   The Barbere patents both require an attachment between the catheter's inner and outer tubes near the distal end of the catheter.

The Barbere '191 and '856 patents are part of a single patent family. The patents share the identical drawings and written description and, not surprisingly, claim nearly identical subject matter.[5] Both patents are directed to balloon dilatation catheters for use in an angioplasty procedure that have an outer tube, a concentric inner tube, and an inflatable balloon—all of which Barbere admitted were well-known in the art. (*Id.* Ex. C at 1:20-44.)

In a typical catheter of this type, the inner and outer tubes were connected at their proximal ends by a Y-connector and at their distal ends by a balloon (one end of the balloon being attached to the distal end of the outer tube and the other end being attached to distal end of the inner tube). In his deposition, Barbere testified that ███████████████████████

---

[5]   Because the Barbere patents are identical (*compare* Woodford Decl. Ex. C *with* Ex. E), only the specification of the '191 patent will be cited in the following description of their disclosures.

████████████████████████████████████████████

The figure below (from a patent discussed during the prosecution of the '191 Barbere patent, but not considered to be prior art) shows an example of these connections.  The arrows show the connections of the inner and outer tubes at the Y-connector (left) and via the balloon (right):



(*Id.* Ex. S.)

Barbere sought to improve existing angioplasty balloon dilatation catheters by reducing their tendency to "collapse or buckle axially" during an angioplasty procedure.  (*Id.* Ex. C at 2:3-5.)  "[I]n a catheter having a shaft formed from inner and outer coaxial tubes … there may be a tendency for the tubes to telescope when presented to increased resistance.  The telescoping of the tubes will tend to draw the ends of the balloon together … to permit the balloons to become bunched up as it is forced through the stenosis [an obstruction or narrowing of the artery]."  (*Id.* at 2:5-12.)  "It is among the principal objects of the invention to provide an improved construction for a PTCA catheter, … which reduces the tendency for the catheter to telescope and buckle … under such axial loads."  (*Id.* at 2:14-19; *see also* 2:36-45, 2:64-3:7, 4:56-63.)

To reduce bucking under axial loads (such as when the distal end of a catheter is pushed through a blockage in an artery), Barbere added a third attachment between the outer and inner tubes, near the catheter's distal end.  In the Barbere patents, the additional attachment is a ring-like spacer (38) interposed between the inner and outer tubes (18 and 20) in Figure 2, below:



*Fig. 2*

(*Id.* Ex. C; *see also id.* at 4:9-18; Ex. D at MEDC000326-327.)  During his deposition, Barbere confirmed that ███████████████████████████████████████████████

███████████████████

Medtronic asserts claim 1 of the '191 patent and claim 9 of the '856 patent.  (*Id.* Ex. I at 2-3.)  Both of these claims contain the following limitation, which requires the additional connection between the inner and outer tubes between the shaft's "proximal region" and distal connection:

> the outer tube being attached to the inner tube at a location between the proximal region of the catheter shaft and said distal connection to resist axial telescoping of the inner tube with respect to the outer tube when the catheter is advanced against a resistance at the distal region of the catheter … .

(Ex. C at 5:26-31.)[6]  Although the Barbere patent specification does not use the term "proximal region," the patents define the "proximal end" of the catheter as the Y-fitting—which can be seen as elements 12 (proximal end) and 26 (Y-fitting) in Figure 1.  (*See also id.* at 3:30-31, 3:54-63.)

### 2.    During prosecution, Bard added the "proximal region" limitation to overcome prior art that had attachments at the Y-connector.

The reason that the term "proximal region" does not appear in the specification is because Bard added this term during prosecution to distinguish the prior art.  The patent examiner rejected Barbere's claims in view of a prior art catheter with tubes attached at the proximal end by a Y-connector and at the distal end by a balloon.  (*Id.* Ex. D at MEDC000297-298, Ex. T at 4:61-5:14, Figs. 3, 4 (Simpson patent).)  The examiner stated that "[t]his attachment inherently resists axial telescoping of the inner tube with respect to the outer tube, especially at the proximal portions of the tubes."  (*Id.* Ex. D at MEDC000297).

To distinguish this reference, Bard amended the claims to require that the attachment be "*between* the proximal region of the catheter shaft and said distal connection," and argued that this amendment "necessarily distinguishes over [the prior art] where the connection referred to by the Examiner (via side arm 76) *is at the proximal region of the catheter*."  (*Id.* at MEDC000303,

---

[6]    Claim 9 of the '856 patent contains the same language, except the phrase "against a resistance at the distal end of the catheter" was replaced with "against a resistance encountered adjacent the distal end of the catheter."  (Ex. E at 5:24-30.)  This difference is not relevant here.

MEDC000311-312 (emphasis added).)  Indeed, Bard left no doubt that an attachment at the Y-connector *is not* between the proximal region of the catheter shaft and distal connection as required by the amended claim.  In the process, Bard dismissed the examiner's argument that an attachment at the Y-connection would inherently resist axial telescoping:

> Moreover, the examiner's conclusion that attaching the inner and outer tubes at their proximal ends "[] inherently resists axial telescoping of the inner tube with respect to the outer tube …" is incorrect.  To the contrary, in the prior art devices that exhibit the axial buckling problem with which applicant's invention is concerned, the connection of the inner and outer coaxial tubes at their proximal ends, but not in a more distal location, is part of the cause of the problem.  Where the outer and inner tubes are connected only at their proximal ends, when the distal end of the catheter (including the balloon and/or distal portion of the inner tube) is unable to advance, continued pushing on the outer tube is transmitted through that proximal connection to the inner tube.  That, in turn is what causes the inner tube to buckle.

(*Id.* at MEDC000312.)  Bard then reiterated that the invention is directed to the reduction of telescoping at the *distal end* of the catheter when it is advanced through a blockage:

> The examiner should note that the problem with which the invention is concerned is not axial telescoping at the proximal ends of the tubes, but rather, the effect of the telescoping at the distal end which enables the balloon to become bunched up, thereby increasing the resistance to further advancement of the catheter.  The invention avoids that problem.

(*Id.*)

Ultimately, Bard had to make these same arguments to the Board of Patent Appeals.  Bard once again explained that the inventive attachment is located near the balloon at the catheter's distal end:

> The present invention first recognizes and then solves the problem of buckling of the inner tube 18 and subsequent telescoping of the outer tube 20 by providing a secure anchor joint at 37 between the inner tube 18 and the outer tube 20 near one end of the balloon.

(*Id.* at MEDC000367.)  The Board allowed the claims and, in so doing, clearly stated its understanding as to the location of Barbere's additional attachment: "[Barbere] endeavors to overcome this alleged deficiency in the prior art by anchoring the distal end of the outer tube to the inner tube *at a location within the balloon* to prevent telescoping of the outer tube over the inner tube at the location of the balloon."  (*Id.* at MEDC000429 (emphasis added).)

KYPHON INC.'S MOTION FOR SANCTIONS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 11
Civil Action No. C06-02559 SI

**3.     Kyphon's IBTs cannot infringe because they do not have an attachment located between the proximal region and distal end.**

Medtronic accuses Kyphon's Xpander® IBTs and Express™ IBTs of infringing the Barbere patents.  (*Id.* Ex. I at 11-19.)  While several limitations of the asserted claims are not satisfied by Kyphon's IBTs, the absence of any sort of third connection between the inner and outer tubes makes Medtronic's infringement claim objectively baseless.  Like the prior art, the inner and outer tubes of Kyphon's IBTs are attached through a balloon at the distal end of the device.  (Ferdinand Decl. ¶¶ 5, 8, Ex. A.)  And like the prior art, the inner and outer tubes of Kyphon's IBTs are connected at the Y-connector located at the proximal end of the IBT.  (*Id.*) There are no other attachments between the inner and outer tubes anywhere in the accused IBTs, much less one between the "proximal region" and "distal end" of the catheter as required by the claims.  (*Id.*)  Indeed, a third connection is unnecessary because Kyphon does not advance the IBTs through blockages in an artery (like those that exist during angioplasty).

Barbere agrees that ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████     As they did with Saab, Medtronic's counsel met with Barbere before his deposition and ███████████████████████████████████████ ██████████████████████     And as with Saab, Medtronic's counsel failed.  (*Id.*)  Consistent with their game plan, Medtronic's counsel then ███████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████

Medtronic's infringement contentions demonstrate that Medtronic could not find the required connection in Kyphon's IBTs.  In its infringement contentions, Medtronic summarily alleges that the "attachment" limitation is satisfied by the attachments at the Y-connector.  (*Id.* Ex. I at 13, 15 (arrow D), 17, 19 (arrow D).)  But the Y-connector in Kyphon's IBTs cannot be the claimed attachment because the plain language of the claims and the prosecution history flatly reject that theory.  Indeed, during prosecution, Bard left no doubt that the Y-connector is *not*

between the "proximal region" and "distal connection" as required.  Because of the arguments made during prosecution, Kyphon cannot infringe the Barbere patents either literally or under the doctrine of equivalents.  *See, e.g.*, *Ekchian*, 104 F.3d at 1304.  Any other interpretation of the claim is unreasonable and cannot even come close to satisfying Rule 11.

### D. Medtronic's Infringement Claims for the Preissman Patent Are Baseless Because Kyphon Does Not Use Spherical Balloons of a Limited Diameter.

#### 1. The Preissman patent discloses a specialized catheter with a braided reinforcement layer and has little, if anything, to do with balloons.

Although the asserted claims of the Preissman patent require balloons that have a specific size and shape, neither the patent's disclosure nor the claims initially submitted to the Patent Office for examination had anything to do with these limitations.  Rather, as the title states— "High Torque Balloon Catheter"—the patent was initially directed to a catheter construction that provides increased flexibility without the typical reduction in the strength and integrity of the catheter walls.  (*Id.* Ex. G at 1:34-2:12.)  According to the patent, prior-art catheters had the tendency to kink, collapse, rupture, or otherwise fail when used in "regions of tortuosity" such as the brain vasculature.  (*Id.*)  To solve this problem, the patent discloses a catheter that includes a braided reinforcement layer over the inner tube that is covered by a soft outer layer that increases strength and reduces the risk of injury to blood vessels.  (*Id.* at 2:50-66.)

#### 2. The Applicants amended their original claims to require a spherical balloon that inflates within a specified range.

Preissman et al. tried to get claims to cover their catheter configuration, but, as it turned out, they were not the first to invent such a configuration.  (*See id.* Ex. H at MEDC000689-693 (listing original claims).)  Despite attempts to amend the claims, the Patent Office rejected them two different times—the second rejection being final.  (*Id.* Ex. H at MEDC00725-727, MEDC000738-741.)

Faced with a final rejection, the applicants decided to abandon the pending claims rather than appeal the Patent Office's decision.  The applicants filed a continuation application and a Preliminary Amendment that cancelled the old claims and added new, amended claims (that now appear in the issued Preissman patent).  (*Id.* at MEDC000744-745 (noting that the applicant's

continuation "automatically abandon's the parent application"), MEDC000746-747.)  In the

remarks that accompanied the Preliminary Amendment, the applicants noted that the previously

pending claims were "finally rejected in the parent application" and "[i]t is believed these new

claims clearly overcome the previously stated rejections and patentably distinguish all art of

record in the parent application."  (*Id.* at MEDC000747.)  Oddly, the amended claims say nothing

about a braided reinforcement layer or any of the other features that the applicants deemed to be

their invention when the patent was first filed.  (*See id.* at MEDC000746-747.)  Instead, the

amended claims recite a catheter that has an inner and outer tube (which the patent calls the "outer

sheath" and "inner tubular member") and a balloon that has a "spherical shape" having a diameter

from 4 mm to 14 mm:

> an elastomeric balloon attached to the distal ends of the inner tubular member and
> the outer sheath to receive inflation medium from the inflation lumen, wherein the
> balloon is inflatable to a spherical shape having a diameter from 4 mm to 14 mm.

(*Id.*; *see also* Ex. G at 10:22-34.)

### 3.    During prosecution, the Applicants relied heavily on the spherical shape and inflation diameter to overcome the prior art.

The prosecution history shows that the balloon's physical characteristics added to the

claims—the "spherical" limitation in particular—were critical to overcoming the prior art.  The

patent examiner rejected the amended claims in view of a catheter having an "expansible member"

with a portion "at least partially made to a substantially cylindrical shape" disclosed in a prior-art

patent (the Nobuyoshi patent).  (*Id.* at H at MEDC000750, Ex. U at 7:59-65.)  In response, the

applicants distinguished the prior art reference by arguing that the expansible member was not

perfectly spherical as recited in the claims:

> Although the Nobuyoshi patent discloses a medical catheter having an expansible
> member, at no point does the patent show or suggest a spherical balloon mounted
> on such a catheter.  The Nobuyoshi catheter instead discloses an expansible
> member having at least "a portion of substantially cylindrical shape for easily
> dilatating [sic] the stricture portion of the blood vessel ..." (col. 14, lines 20-24).
> No text or figure is directed towards a spherical member.  This distinction alone
> should be sufficient to traverse the current rejections.

(*Id.* Ex. H at MEDC000758.)  The applicants also argued that a mechanically-disruptive, non-

spherical balloon is not equivalent to a spherical one because a spherical balloon provides only a "minimal mechanical disruption of the vascular wall":

> To conclude equivalence would be to oversimplify the analysis of the expansible member on the Nobuyoshi catheter and the present invention.  The geometry of a spherical expansible member offers specific performance advantages that are not found in cylindrical members.  <u>A spherical balloon, when fully inflated to the diameter of a blood vessel, will contract the vessel wall only at the sphere's greatest circumference while a cylindrical balloon will contact the vessel wall over the cylinder's entire length</u>.  The Nobuyoshi cylindrical balloon is designed to exhibit high mechanical disruption of a blood vessel wall to remodel the atherosclerotic constriction in the artery.  It does so through a high amount of surface contact with the constriction.  In particular operations of the present catheter, such as aneurysm repair, we wish to slow or stop fluid flow with minimal mechanical disruption to the wall of the vasculature.  The spherical shaped balloon can occlude the vessel with only tangential contact of the balloon with the vessel wall.  A cylindrical balloon risks excessive disturbance of the vessel wall, which is particularly undesirable … .

(*Id.* at MEDC000758-759 (emphasis in original).)

Based on these arguments, the examiner allowed the amended claims.  In fact, the examiner's reasons for allowance explained that "[t]he prior art of record does not disclose a balloon catheter having a **spherical** balloon attached to the distal ends of an inner tubular member and an outer sheath."  (*Id.* at MEDC000762 (emphasis in original).)  These arguments and reasons for allowance leave no doubt that the claims of the Preissman patent require a spherical balloon with a diameter from 4 mm to 14 mm.

### 4. Kyphon's balloons cannot literally infringe because they are not spherical and do not have a diameter from 4 mm to 14 mm.

Medtronic accused only the Xpander® and Express™ IBTs with a 10 mm uninflated balloon length of infringing the Preissman patent.  But neither of these IBTs can infringe because they do not have a spherical balloon and inflate beyond the 14 mm maximum diameter explicitly recited in the claims.

To satisfy the "spherical" limitation, Kyphon's balloons must have an identical length and diameter when inflated.  (*See id.* Ex. V (various definitions of "spherical").)  That is not the case for either of the accused IBTs.  The table below shows that the length of Kyphon's balloons

greatly exceeds their diameter at all times during inflation:[7]

**KyphX Xpander® 10 mm IBT**

| Volume (cc) | Length (mm) | Diameter D1 (mm) | Diameter D2 (mm) | Diameter D3 (mm) |
|---|---|---|---|---|
| 2.0 | 11.98 | 9.09 | 9.05 | 9.08 |
| 4.0 | 17.40 | 15.50 | 15.45 | 15.70 |
| 6.0 | 21.32 | 18.18 | 18.06 | 18.38 |

**KyphX® Express™ 10 mm IBT**

| Volume (cc) | Length (mm) | Diameter D1 (mm) | Diameter D2 (mm) | Diameter D3 (mm) |
|---|---|---|---|---|
| 1.0 | 10.34 | 5.30 | 5.21 | 4.42 |
| 2.0 | 14.25 | 10.69 | 10.45 | 10.55 |
| 3.0 | 17.69 | 13.59 | 13.23 | 13.41 |
| 4.0 | 20.50 | 15.35 | 14.86 | 15.00 |

(Ferdinand Decl. ¶¶ 10-11, Exs. B-D.)  Because the lengths and diameters of the balloons are not equal, the balloons are not spherical and do not infringe the asserted claims.

Indeed, Kyphon purposely manufactures its balloons so they are not spherical.  Kyphon's own patent, filed in 1997 and issued in 2001, explains that spherical balloons are undesirable because they provide single points of contact, rather than the long contact surface necessary to support the spine:

> Spherical shapes will not allow the hardened bone cement to support the spine adequately, because they make single points of contact on each vertebral body surface (the equivalent of a circle inside a square, or a sphere inside a cylinder). The balloons of the present invention recreate the flat surfaces of the vertebral body by including restraints that keep the balloon in the desired shape. This maximizes the contacts between the vertebral body surfaces and the bone cement, which strengthens the spine.

(Woodford Decl. Ex. W at 5:58-67.)  Of course, the goal of maximum contact for the Kyphon balloons is the exact opposite of the goal of Preissman, which is to provide minimal contact only at the sphere's maximum circumference.  (*Id*. Ex. H at MEDC000758-759.)  Likewise, Kyphon's IBTs are intended to create a significant mechanical disruption within the vertebra by compacting

---

[7]   The data in the table show that as the balloons on Kyphon's IBTs inflate, the inner tube stretches and, in turn, allows the balloon's length to expand from its initial length of 10 mm. (Ferdinand Decl. ¶ 9.)  The table also provides three diameter measurements for the balloon because Kyphon's balloons are fabricated in a "peanut" shape, which can be seen in the photographs of the Kyphon product *supra*.  Diameters D1 and D2 represent the two "humped" areas of the balloon and measurement D3 represents the area between the "humps." (*Id*. ¶¶ 10-11.)

bone (just as Nobuyoshi's was to compact arterial plaque), while Preissman's express goal is to minimize mechanical disruption to the blood vessel.

The data in the table above also show that, at full recommended inflation (4 ccs), both the Xpander® and Express™ balloons have a diameter that exceeds 14 mm at measurement points (D1, D2, and D3). This provides yet another reason why Medtronic's infringement contentions are objectively baseless.

### 5.    Any attempt by Medtronic to invoke the doctrine of equivalents would be barred as a matter of law.

Because Kyphon's balloons do not actually satisfy the limitations of the asserted Preissman claims, Medtronic's infringement contentions repeatedly invoke the doctrine of equivalents. (*Id.* Ex. I at 22.) But Medtronic does not explain how Kyphon's non-spherical balloons could actually be equivalent to the spherical balloons claimed in Preissman. In the end, Medtronic's silence does not matter because any claim of equivalence is barred as a matter of law.

First, Medtronic cannot rely on the doctrine of equivalents to show infringement because the amendments made during prosecution create estoppel. The "spherical" and "diameter" limitations were added by amendment in a continuation application filed after the examiner's final rejection of the parent's claims. Such a narrowing amendment creates estoppel and a presumption that all equivalents have been surrendered. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1367 (Fed. Cir. 2003) (en banc); *see also Desper Prods., Inc. v. QSound Labs., Inc.*, 157 F.3d 1325, 1339 (Fed. Cir. 1998) (finding estoppel where claims were finally rejected in a parent application and the applicants amended the claims in a continuation application rather than appealing); *Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285 (Fed. Cir. 1995). And Medtronic cannot rebut the presumption that the applicants surrendered all equivalents by the amendment because any potential alleged equivalent (1) would have been foreseeable at the time of the amendment, (2) would not have been tangential because the amendment was intended to "overcome the previously stated rejections and patentably distinguish all art of record in the parent application," and (3) could have been reasonably described by the applicants. *See Festo*, 344 F.3d at 1369-70 (describing the three possible ways to rebut the

1    presumption of surrender).

2         Access to the doctrine of equivalents is also barred by argument-based estoppel.  *See Wang*

3    *Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1578 (Fed. Cir. 1997) ("Arguments and

4    amendments made to secure allowance of a claim, especially those distinguishing prior art,

5    presumably give rise to prosecution history estoppel.").  By distinguishing the prior art on the

6    basis that the disclosed "expansible member" was at least partly elongated into a cylindrical-type

7    shape, Medtronic cannot now assert that the non-spherical, elongated Kyphon IBTs infringe.  *See,*

8    *e.g.*, *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1376 (Fed. Cir. 1999)

9    ("Prosecution history estoppel precludes a patentee from obtaining under the doctrine of

10   equivalents coverage of subject matter that has been relinquished during the prosecution of its

11   patent application."); *see also Day Int'l*, 260 F.3d at 1349-50 (affirming summary judgment of no

12   infringement under the doctrine of equivalents based on disavowal of prior art during prosecution).

13        Finally, a finding that Kyphon's elongated balloons are equivalent to the claimed

14   "spherical" balloon would entirely vitiate the "spherical" limitation.  *See Bicon, Inc. v. Straumann*

15   *Co.*, 441 F.3d 945 (Fed. Cir. 2006) (finding no equivalence as a matter of law where the claim

16   required a "frusto-spherical" shape and the accused product was conical); *Tronzo v. Biomet, Inc.*,

17   156 F.3d 1154, 1160 (Fed. Cir. 1998) (finding no equivalence as a matter of law because "it would

18   write the 'generally conical outer surface' limitation out of the claims" if a hemispherical-shaped

19   device were found to infringe).  Thus, there can be no equivalence as a matter of law.

20        The facts that Kyphon's balloons do not literally meet the spherical and diameter range

21   limitations of the claim and that access to the doctrine of equivalents is barred as a matter of law

22   could have easily been determined by Medtronic before it filed suit.  Indeed, all Medtronic had to

23   do was inflate the accused IBTs during its presuit investigation and take a few simple

24   measurements.  Medtronic's decision to add this patent in its Amended Complaint and its pursuit

25   of these baseless claims violate Rule 11.

26   **E.    Medtronic and Its Counsel Should Be Sanctioned for Their Frivolous**
          **Infringement Claims.**
27

28        Medtronic's infringement claims for every one of the asserted patents are both factually

                                        24        KYPHON INC.'S MOTION FOR SANCTIONS PURSUANT TO
                                                  FEDERAL RULE OF CIVIL PROCEDURE 11
                                                  Civil Action No. C06-02559 SI

1    and legally baseless.  Given the significant, yet straightforward deficiencies in its infringement

2    theories, Medtronic and its counsel plainly failed to perform a reasonable and competent

3    infringement analysis before filing this suit.  Even the inventors for three of these patents agree

4    that Kyphon's products have nothing to do with their inventions and cannot possibly infringe.  By

5    filing suit and maintaining these infringement claims, Medtronic and its counsel violated Rule 11.

6    *See Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997) (finding a denial of Rule 11

7    sanctions to be an abuse of discretion where the plaintiff did not have "a basis, well-grounded in

8    fact, for bringing the suit").

9         The goal of Rule 11 is to deter baseless filings.  *Cooter & Gell v. Hartmax Corp.*, 496

10   U.S. 384, 405 (1990).  Imposing sanctions against Medtronic in this case furthers Rule 11's

11   purpose.  Medtronic's claims of infringement are intended to harm Kyphon.  As the Federal

12   Circuit has recognized, "[a] patent suit can be an expensive proposition.  Defending against

13   baseless claims of infringement subjects the alleged infringer to undue costs–precisely the scenario

14   Rule 11 contemplates."  *View Eng'g*, 208 F.3d at 986.  Indeed, given its specious infringement

15   claims and its desire to publicize them, Medtronic is more interested in damaging Kyphon than in

16   actually protecting its intellectual property rights.  Kyphon therefore respectfully requests that

17   Medtronic's patent infringement claims (Count I of the Amended Complaint) be dismissed with

18   prejudice and that Medtronic and/or its counsel be ordered to pay Kyphon's attorney fees and

19   expenses incurred in defending against Medtronic's infringement claims.

20   **V.     CONCLUSION**

21        Kyphon respectfully requests that the Court sanction Medtronic and its counsel for

22   bringing and maintaining baseless patent infringement claims in violation of Rule 11.

23   Dated:  September 25, 2006                    FISH & RICHARDSON P.C.

24

25                                                By:  s/ William R. Woodford

26                                                     William R. Woodford

27                                                Attorney for Defendant
                                                  KYPHON INC.
28

1

## <u>PROOF OF SERVICE</u>

2

I certify that, on September 1, 2006, pursuant to Fed. R. Civ. P. 11(c), I caused a copy of

3

Kyphon's Rule 11 motion and supporting documents by U.S. Mail or by electronic mail (as

4

indicated) on the individuals listed in the table below:

5

- Kyphon Inc.'s Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11

6

- Declaration of William R. Woodford In Support of Kyphon Inc.'s Motion for

7

Sanctions Pursuant to Federal Rule of Civil Procedure 11

8

- Declaration of Arthur E. Ferdinand In Support of Kyphon Inc.'s Motion for Sanctions

9

Pursuant to Federal Rule of Civil Procedure 11

10

11   Sean DeBruine (sdebruine@akingump.com)     Attorneys for Plaintiffs
     Akin, Gump, Strauss, Hauer & Feld, L.L.P.    MEDTRONIC, INC., MEDTRONIC
     3000 El Camino Real, Suite 400               VASCULAR, INC., MEDTRONIC
12   Palo Alto, CA 94306                          USA, INC., MEDTRONIC VASCULAR
     Telephone:  (650) 838-2000                   GALWAY, LTD., MEDTRONIC
13   Facsimile:  (650) 838-2001                   SOFAMOR DANEK, INC., & SDGI
                                                  HOLDINGS, INC.
14   Via U.S. Mail & Electronic Mail

15   Steven M. Zager (szager@akingump.com)
     Michael Simons (msimons@akingump.com)
16   Akin, Gump, Strauss, Hauer & Feld, L.L.P.
     1111 Louisiana Street, 44th Floor
17   Houston, TX 77002
     Telephone:  (713) 220-5800
18   Facsimile:  (713) 236-0822

19   Via Electronic Mail Only

20

21   I declare under penalty of perjury that the above is true and correct.  Executed on

September 25, 2006.

22

23                                               s/ William R. Woodford
                                                 _____
                                                 William R. Woodford
24   Rule 11 Motion - REDACTED.doc

25

26

27

28

KYPHON INC.'S MOTION FOR SANCTIONS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 11
Civil Action No. C06-02559 SI