Sean P. DeBruine (SBN 168071)(sdebruine@akingump.com)
AKIN GUMP STRAUSS HAUER & FELD LLP
1950 University Avenue, Suite 505
East Palo Alto, CA 94303
Telephone: (415) 765-9500
Facsimile: (415) 765-9501

Steven M. Zager (*pro hac vice*)(szager@akingump.com)
Michael Simons (*pro hac vice*)(msimons@akingump.com)
AKIN GUMP STRAUSS HAUER & FELD LLP
1111 Louisiana Street, 44th Floor
Houston, Texas 77002
Telephone: (713) 220-5800
Facsimile: (713) 236-0822

Michael A. O'Shea (*pro hac vice*)(moshea@akingump.com)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

Attorneys for Plaintiffs
MEDTRONIC, INC.,
MEDTRONIC VASCULAR, INC.,
MEDTRONIC USA, INC.,
MEDTRONIC VASCULAR GALWAY, LTD.,
MEDTRONIC SOFAMOR DANEK, INC., and
SDGI HOLDINGS, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## (SAN FRANCISCO DIVISION)

| | |
|---|---|
| MEDTRONIC, INC.,<br>MEDTRONIC VASCULAR, INC.,<br>MEDTRONIC USA, INC.,<br>MEDTRONIC VASCULAR GALWAY, LTD.,<br>MEDTRONIC SOFAMOR DANEK, INC., and<br>SDGI HOLDINGS, INC.<br><br>　　　　　　Plaintiffs,<br>　　v.<br><br>KYPHON INC.,<br>　　　　　　Defendant. | **CASE NO. C06-02559 SI**<br><br>**PLAINTIFFS' OPENING *MARKMAN* BRIEF** |

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     THE CLAIMED "BALLOON/DILATATION" CATHETERS ..................................... 5

III.    THE '173 PATENT:  "SPHERICAL SHAPE" .........................................................10

IV.     THE CLAIM TERMS IN THE '349 PATENT ARE CLEAR FROM THE CLAIM
        LANGUAGE..........................................................................................................13

        A.      "sleeve" ...................................................................................................14

        B.      "balloon portion"/"balloon" ......................................................................15

        C.      "both the sleeve and balloon being collapsible about the shaft" ...............17

V.      THE CLAIM TERMS IN THE '191 AND '856 PATENTS ARE CLEAR FROM THE
        CLAIM LANGUAGE ...........................................................................................19

        A.      "catheter shaft" ('191 patent/'856 patent)..............................................20

        B.      "proximal region" ('191 patent/'856 patent)...........................................23

        C.      "guidewire lumen" ('191 patent/'856 patent)..........................................29

        D.      "means for communicating the annular inflation lumen with the interior of the
                balloon to facilitate inflation and deflation of the balloon, the inflation lumen
                comprising the sole lumen in communication with the interior of the balloon"
                ('191 patent) ...........................................................................................30

        E.      "means at the proximal end of the catheter for accessing
                •  each of the guidewire and inflation lumens" ('191 patent)
                •       the inflation lumen" ('856 patent ..........................................35

        F.      "at least one aperture associated with the outer tube to facilitate inflation and
                deflation of the balloon".............................................................................38

VI.     CONCLUSION .......................................................................................................38

## **TABLE OF AUTHORITIES**

**CASES**

*AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234 (Fed. Cir. 2003)..........................................33

*ASM America, Inc., et al. v. Genus, Inc.*, 260 F.Supp.2d 827 ...............................................32

*Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F.Supp.2d 423 (S.D. N.Y. 2002) ...............................16

*Brookhill-Wilk 1, LLC v. Intuitive Surg., Inc.*, 334 F.3d 1294 (Fed. Cir. 2003)................................7, 30

*C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340 (Fed. Cir. 1998)..............................................6

*Catalina Mktg. Int'l, Inc. v. Cool Savings.com, Inc.*, 289 F.3d 801 (Fed. Cir. 2002) ........................6, 7

*Cole v. Kimberly-Clark Corp.*, 102 F.3d 524 (Fed. Cir. 1996) ...............................................31

*Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352 (Fed. Cir. 2003) .....................................19

*D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570 (Fed. Cir. 1985) .................................................8

*DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314 (Fed. Cir. 2001).......................................23

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005 (Fed. Cir. 2006) ................. 11, 12

*Dorel Juvenile Group, Inc. v. Graco Children's Prods.*, 429 F.3d 1043 (Fed. Cir. 2005).....................16

*Dow Chemical Co. v. Sumitomo Chemical Co.*, 257 F.3d 1364 ..........................................12, 17

*Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360 (Fed. Cir. 2000).................................32

*E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364 .......................................................11, 19

*Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948 (Fed. Cir. 1993).............................................11

*IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422 (Fed. Cir. 2000)....................................6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004).........18, 19

*Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365

   (Fed. Cir. 2002) .....................................................................................26, 29

*K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356 (Fed. Cir. 1999) .............................................23, 38

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364 (Fed. Cir. 2006) .....................................5

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004)......................................7, 8

*McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110 (1895) ...................................................5

*Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313 (Fed. Cir. 2005).......................................20

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)...............................................passim

*RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255 (Fed. Cir. 2003)....................18, 25

*Roberts v. Ryer*, 91 U.S. 150 (1875) .......................................................................8

*Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420 (Fed. Cir. 1997) ....................................31, 35

*Schumer v. Laboratory Comp. Sys., Inc.*, 308 F.3d 1304 (Fed. Cir. 2002).....................................5

*Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318 (Fed. Cir. 2002) ........................19

*Springs Windows Fashions LP v. Novo Ind. LP*, 323 F.3d 989 (Fed. Cir. 2003) ....................................29

*Taskett v. Dentlinger*, 344 F.3d 1337 (Fed. Cir. 2003) ............................................................8

*Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313 (Fed. Cir. 2002)................................7, 15

*Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367 (Fed. Cir. 2001) ...................................30

*Torpharm, Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322 (Fed. Cir. 2003)................................23

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370 (Fed. Cir. 2000)...........................16

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A*, 944 F.2d 870 (Fed. Cir. 1991) .................6

*Watts v. XL Sys., Inc.*, 232 F.3d 877 (Fed. Cir. 2001) ............................................................31

*Yoon Ja Kim v. Conagra Foods, Inc.,* 465 F.3d 1312 (Fed. Cir. 2006) ..........................................15

*Zenith Electronics Corp. v. Exzec, Inc.*, No. 93 C 5041, 1995 WL 275591 at *5

   (N.D. Ill. May 8, 1995)................................................................................16

**STATUTES**

35 U.S.C. § 112 ¶ 6. ........................................................................................31

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| "Medtronic" | Plaintiffs Medtronic, Inc., Medtronic Vascular, Inc., Medtronic USA, Inc., Medtronic Vascular Galway, Ltd., Medtronic Sofamor Danek, Inc., and SDGI Holdings, Inc. |
| "Kyphon" | Kyphon, Inc. |
| "'173 patent" | U.S. Patent No. 5,759,173 to Preissman *et al.* "High Torque Balloon Catheter" |
| "'349 patent" | U.S. Patent No. 4,820,349 to Saab "Dilatation Catheter with Collapsible Outer Diameter" |
| "'191 patent" | U.S. Patent No. 5,759,191 to Barbere "Coaxial PCTA Catheter with Anchor Joint" |
| "'856 patent" | U.S. Patent No. 6,179,856 to Barbere "Coaxial PCTA Catheter with Anchor Joint" |
| "Medtronic patents" | The '173, '349, '191 and '856 patents |
| "Pope patent" | U.S. Patent No. 4,715,378 to Pope, Jr. *et al.* "Balloon Catheter" |
| "Simpson patent" | U.S. Patent No. 4,323,071 to Simpson *et al.* "Vascular Guiding Catheter Assembly and Vascular Dilating Catheter Assembly and a Combination Thereof and Methods of Making the Same" |
| "Yock patent" | U.S. Patent No. 5,061,273 to Yock "Angioplasty Apparatus Facilitating Rapid Exchanges" |
| "DeBruine Decl." | Declaration of Sean DeBruine in Support of Medtronic's Opening *Markman* Brief |

iv

**TABLE OF APPENDICES**

A.      The '173 patent

            1.      Claim 1

            2.      Claim 4

            3.      Claim 5

B.      The '349 patent

            1.      Claim 1

            2.      Claim 4

            3.      Claim 5

C.      The '191 patent

            1.      Claim 1

D.      The '856 patent

            1.      Claim 9

## **TABLE OF EXHIBITS**

A.    '173 Patent

    1.    '173 Prosecution History

    2.    July 9, 1997 Amendment

B.    '349 Patent

    1.    '349 Prosecution History

    2.    August 10, 1988 Amendment

C.    '191 Patent

    1.    '191 Prosecution History

    2.    April 16, 1992 Examiner Interview Summary Record

    3.    July 16, 1992 Response

    4.    November 14, 1994 Amendment

    5.    May 10, 1994 Amendment

    6.    January 10, 1995 Office Action

    7.    October 23, 1997 Decision of The Board of Patent Appeals and Interferences

D.    '856 Patent

    1.    '856 Prosecution History

    2.    February 16, 1999 Office Action

    3.    January 3, 2000 Office Action

    4.    July 29, 1999 Office Action

    5.    June 26, 2000 Amendment

    6.    May 24, 1999 Amendment

E.    July 2002 *In Vivo* Article entitled *Kyphon: A Trial Balloon Succeeds in Spine, Can balloon technology transform orthopedics the way it did cardiovascular devices?*

I.      U.S. Pat. No. 5,290,306 to Trotta *et al.*

J.      U.S. Pat. No. 5,308,325 to Quinn *et al.*

K.      U.S. Pat. No. 3,543,759 to McWhorter

L.      U.S. Pat. No. 4,335,723 to Patel

M.      Kyphon Descriptions of Kyphon Inflatable Bone Tamps as "Balloon Catheters"

    1.      Kyphon 2000 SEC S-1 Registration Statement

N.      Dictionary Definitions of "Spherical"

    1.      "Spherical" (Webster's 3rd New International Dictionary, 1995)

    2.      "Sphere" (Random House Webster's Unabridged Dictionary, 2001)

O.      Nobuyoshi Patent

P.      Dictionary Definition of "Sleeve"

Q.      Manual of Patent Examining Procedure § 2173.05(e)

R.      Pope Patent

S.      Simpson Patent

T.      Dictionary Definition of "Proximal"

U.      Dictionary Definition of "Distal

V.      Yock Patent

W.      Dictionary Definition of Lumen

I.      **INTRODUCTION**

This case is about "balloon catheters" – medical devices inserted and inflated in the body. Doctors use balloon catheters to treat nearly every area of the body, including the urinary tract, digestive tract, circulatory system, heart, brain,  and skeleton.

Medtronic is a medical device company whose mission is to contribute to human welfare by developing instrumentation that alleviates pain, restores health, and extends life.  Medtronic and its subsidiaries have been leaders in catheter technology for over three decades, with hundreds of catheter patents.  The Medtronic inventions at issue in this case are several examples of the improvements that have helped the global catheter market expand past its early simple models.  Each invention provides the doctor with a new tool to solve a difficult problem that had plagued the prior models.

The four patents-in-suit are owned by Medtronic Vascular, Inc., a division located in Santa Rosa, California.  Medtronic Vascular was built through Medtronic's in-house development of catheter technology.  Medtronic also expanded its catheter product line by acquiring several innovative catheter companies in the 1990s.  In fact, the inventions at issue here were initially developed by two companies that were later acquired by Medtronic.

The first company is Micro Interventional Systems, Inc. ("MIS"), which was also based in Northern California.  MIS filed the '173 patent application in 1994.  The '173 patent claims coaxial catheters with spherically shaped balloons.  "Coaxial" catheters are catheters with two tubes:  a narrower tube is located inside a wider tube; both tubes share the same longitudinal axis, and thus are "coaxial."  Prior to the '173 patent, the balloons in coaxial catheters were cylindrically shaped, which limited their ability to function in the body cavities into which they were inserted.

The second such company is C.R. Bard, a subsidiary of Arterial Vascular Engineering ("A.V.E."), acquired by Medtronic in 1998.  The '349, '191, and '856 patents at issue here were

invented in the late 1980s at C.R. Bard and concern several of the critical developments for the growth of the worldwide balloon catheter market.

Prior to the '349 patent, the distal (front) end of catheters was considerably thicker than its opposite proximal (back) end, since it contained not only a shaft, but also the balloon. This problem was exacerbated when a large balloon was attached at the distal end. With such a thick profile, it was difficult to insert balloon catheters through narrow body openings. Until the '349 patent, it appeared that catheter use would be limited by the size of the opening in the body cavity. The invention in the '349 patent solved this problem by creating a "reduced profile" catheter, having (1) a shaft with a narrower distal segment, and (2) a collapsible balloon. By separating the shaft into two distinct segments, the distal end of the catheter shaft could be made far narrower than before. Moreover, by attaching a collapsible balloon to this narrow distal end, the diameter at the distal end of the catheter could be further minimized. The advantages of such a reduced profile are numerous, including the ability for the first time for the doctor to be able to push a large balloon through a narrow body opening.

Another problem in early coaxial catheter models was "axial telescoping." That is, the inner tube would push back into the outer tube (as in a telescope) when it met with a resistance. Such relative movement between the tubes often caused malfunctions in the catheter. The '191 and '856 patents solved this problem by providing an attachment between the tubes that allowed them to resist axial telescoping. The benefits of such an attachment are extraordinary – the doctor was able to push harder at the proximal (back) end, especially in body cavities that offered significant resistance.

Kyphon sells balloon catheters for use in the spine. Kyphon did not sell its first catheter until the late 1990s and owes its existence to the catheter innovations that came before it. Without the inventions claimed in the four patents-in-suit, Kyphon's balloon catheters simply would not exist. For example, all of Kyphon's balloon catheters are inserted into the spine through a narrow tube (or

"cannula").  The reduced profile of the '349 patent allows the Kyphon balloon catheters to be inserted through this narrow tube.  Additionally, Kyphon's balloon catheters contain the attachment invented in the '191 and '856 patents that allows the catheters to resist axial telescoping.  Likewise, Kyphon markets coaxial catheters with spherically shaped balloons – which utilize all of the advantages of the '173 patent.  Without these inventions, the Kyphon balloon catheters would be unsuited for insertion and inflation in a patient's spine.

There are no documents, either internal or public, that attempt to allege that Kyphon was responsible for the development of the structure of its balloon catheters.  For example, Kyphon has acknowledged in published articles quoting its founders that its entire company was created through using existing balloon catheter technology used in angioplasty.  The July 2002 issue of *In Vivo* contains the article *Kyphon: A Trial Balloon Succeeds in Spine, Can balloon technology transform orthopedics the way it did cardiovascular devices?*  (DeBruine Decl. Exh. E.)  The author, David Cassak, interviewed the founders of Kyphon and summarized one of the article's major points:

> [U]sing technology ***borrowed from balloon angioplasty***, Kyphon has developed instrumentation that represents not just a new technological solution, but more fundamentally, a new clinical approach to this serious problem.

(*Id.* at 1; emphasis added.)

The article later advises that Dr. Mark Reiley and Arie Scholten, two founders of Kyphon, "tried off-the-shelf angioplasty balloons and were encouraged enough to file ***a method patent*** on their new approach to vertebral compression fractures."  (*Id.* at 4; emphasis added.)  The fact that Kyphon only filed "method" patents – rather than "apparatus" patents – is a tacit admission that Kyphon did not invent a new device.  Rather, Kyphon recognized that, at most, it believed it had developed a new use for an already patented device.

Karen Talmadge, another Kyphon founder quoted in the *In Vivo* article, acknowledged that the Kyphon products were from existing angioplasty catheters:

'I'm not saying there weren't challenges,' she says, 'but technologically, **we didn't have to build the device out of whole cloth.** We just had to solve some problems with the **current technology, which functioned well in** vessels, but not as well in bone.'

(*Id.* at 4; emphasis added.) Kyphon should not be surprised that commercializing balloon catheters incorporating "borrowed" technology would infringe the patent rights of a catheter company such as Medtronic.

One of Kyphon's                    plans further confirms that its developers simply used off-the-shelf balloon catheters in developing their product line:

Dr. Reiley's testimony further explains the history:

\*   \*   \*   \*   \*

Kyphon has recently gone to great lengths in an attempt to rewrite its history, now referring to its balloon catheters as balloon "tamps" in its marketing materials. But the documents and the devices tell a different story.

Kyphon's claim interpretation positions likewise attempt to rewrite the claim language *in the* Medtronic patents, adding non-existent limitations into the claims in an effort to restrict Medtronic's

1   patent rights.  However, the Court of Appeals for the Federal Circuit rejected such a practice in *Phillips*

2   *v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).  The *Phillips* court stressed that the plain and ordinary

3   meaning of the words of the claims controls the interpretation and cited to well-settled precedent that

4   rejects adding words to a claim.  *Id.* at 1312 (*citing McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110,

5   116 (1895) ("if we once begin to include elements not mentioned in the claim, in order to limit such

6   claim …, we should never know where to stop")).

7        This precedent is vital in addressing the disputes here.  Medtronic's proposed interpretations

8   focus on the words of the claims, whereas Kyphon repeatedly seeks impermissibly to add or subtract

9   words from the claim language.

10       The parties dispute 13 terms in the claims of the Medtronic patents:  "balloon catheter,"

11  "dilatation catheter," "balloon dilation catheter," "spherically shaped," "sleeve," "balloon

12  portion/balloon," "collapsible," "catheter shaft," "proximal region," "means for communicating,"

13  "guidewire lumen," "means at the proximal end for accessing," and "at least one aperture."  A typed

14  version of each claim at issue is attached in the Appendix to this brief.

15       As demonstrated below, Medtronic provides multiple reasons in support of its interpretations of

16  these terms.  Fairness and justice dictate that these terms be given their plain and ordinary meaning.

17  **II.    THE CLAIMED "BALLOON/DILATATION" CATHETERS**

18       Medtronic does not believe that any of the preamble terms of the claims at issue need to be

19  construed by the Court.  The preamble of a claim that describes characteristics of the claimed invention

20  is not a limitation.  That is precisely the case here.  *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d

21  1364, 1372 (Fed. Cir. 2006) (preamble term "image processing system" did not require multiple

22  displays, given that claim body recited a display); *Schumer v. Laboratory Comp. Sys., Inc.*, 308 F.3d

23  1304, 1310 (Fed. Cir. 2002) (describing preamble as "superfluous" where it only set out the

24  characteristics of the coordinate system in which the method was to be performed).

Nor is the preamble a limitation where it merely serves as a reference point of claim construction. *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A*, 944 F.2d 870, 880 (Fed. Cir. 1991) (preamble described a reference point for the construction of the claim).

Here, the preamble terms are "dilation catheter," "balloon dilation catheter," and "balloon catheter." None of these preamble terms requires the claimed inventions to be used in blood vessels. If anything, these preambles are statements of reference points for understanding and construing the claims. *Bard*, 157 F.3d at 1350; *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 810 (Fed. Cir. 2002). Furthermore, these phrases only provide a name for the structural complete invention, and therefore are not limitations on the claim. *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000).

In sum, the Court need not address the preamble of the claims at issue. Alternatively, the Court should adopt Medtronic's claim construction as set forth below.

| "balloon catheter" ('173 patent) | |
| --- | --- |
| **Medtronic** | **Kyphon** |
| A catheter capable of being inserted into a body cavity, the catheter having a member that is capable of enlarging. | A catheter having an inflatable balloon for use in a blood vessel. |

| "dilatation catheter" ('349 patent) | |
| --- | --- |
| **Medtronic** | **Kyphon** |
| A catheter capable of being inserted into a body cavity, the catheter having a member that is capable of enlarging. | A catheter for dilating a constricted blood vessel with an inflatable balloon. |

| "balloon dilatation catheter" ('191 and '856 patents) | |
| --- | --- |
| **Medtronic** | **Kyphon** |
| A catheter capable of being inserted into a body cavity, the catheter having a member that is capable of enlarging. | A catheter for dilating a constricted blood vessel with an inflatable balloon. |

The claimed catheters are not limited to any specific use and, therefore, may be used in any manner. Kyphon argues that these catheters are limited to only "use in a blood vessel." Medtronic's

interpretation is correct for nine reasons:

1.   Claim language:   The words of the claims are clear.   The claims call for "balloon," "dilatation," or "balloon dilatation" catheters.   There is no limitation to their use.   For example, the claims in the '191 and '856 patents refer to the ability of the inner tube of the catheter to withstand a generic "resistance."   If the claims were limited to only vascular use, the claims would have referred to a specific type of resistance in blood vessels, such as a "stenosis."

2.   Kyphon improperly seeks to read limitations into the claims:   It is well-settled that a limitation may not be read from the specification into the claims.   *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1327-28 (Fed. Cir. 2002).   Kyphon may not take language from the specification describing the catheter's use in angioplasty and add that to the claim.   It is improper to read such a limitation into the claims from the specification.   *Brookhill-Wilk 1, LLC v. Intuitive Surg., Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor anticipated that the subject matter may be used in a particular manner does not limit the scope to that narrow context.").

3.   Narrowing language was added and then deleted during prosecution:   The phrase "during angioplasty procedure" was added during prosecution to claim 1 of the '191 patent application (Exh. C2, April 16, 1992 Examiner Interview Summary Record; Exh. C3, July 16, 1992 Response at 2) and then removed shortly thereafter.   (Exh. C4, November 14, 1994 Amendment at 2.)   Such removal of a term makes clear that the limitation is **not** present.   *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909 (Fed. Cir. 2004).

4.   Apparatus claims:   Although the preferred embodiments described in the specifications involve use in the vascular system, all of the asserted claims are apparatus claims that have no required use.   *Catalina Mktg. Int'l, Inc. v. Cool Savings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002); *Roberts v. Ryer*, 91 U.S. 150, 157 (1875) ("The inventor of a machine is entitled to the benefit of all the uses to

1   which it can be put, no matter whether he had conceived the idea of the use or not.").  It is, therefore,

2   improper to read a required use into the claims.

3       5.   <u>Claim differentiation</u>:  Many of the claims at issue have unasserted dependent claims

4   that require use in a blood vessel – through angioplasty.  (*See* claims 11-17 of the '349 patent, Exh. B.)

5   Claim differentiation is at its strongest in such a situation.  *Phillips*, 415 F.3d at 1315 ("the presence of

6   a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in

7   question is not present in the independent claim"); *Liebel-Flarsheim,* 358 F.3d at 910; *D.M.I., Inc. v.*

8   *Deere & Co.*, 755 F.2d 1570, 1574 (Fed. Cir. 1985) ("Where, as here, the limitation sought to be 'read

9   into' a claim already appears in another claim, the rule [that the limitation cannot be read into a claim]

10  is far more than 'general.'  It is fixed.").  Thus, claim differentiation dictates that this use, in a blood

11  vessel, cannot be read into the independent claims.

12      6.   <u>The specifications do not limit the use of the catheters</u>:  Each of the specifications

13  clearly states that the preferred embodiments are not to be limited to only the uses disclosed.  (*See,*

14  *e.g.*, Exh. C, '191 patent, Col. 5, lines 2-6:  "It should be understood, however, that the foregoing

15  invention is intended merely to be illustrative thereof and that other embodiments and modifications

16  may be apparent to those skilled in the art without departing from its spirit."; *see also* Exh. A, '173

17  patent, Col. 10, lines 16-19; Exh. B, '349 patent, Col. 8, lines 27-31; Exh. D, '856 patent, Cols. 4 and

18  5, lines 67, 4..)  *See Taskett v. Dentlinger*, 344 F.3d 1337, 1340 (Fed. Cir. 2003) (appellant argued that

19  interpretation of "financial authorization" must be limited by the specification to an actual third party

20  financial authorization.  The Federal Circuit disagreed because the specification included the statement

21  that "the present description is provided only by way of illustrative example … [and] numerous

22  modifications and alternate embodiments of the invention will occur to those skilled in the art.").

7.     <u>The cited art clearly demonstrates that balloon/dilatation catheters have many uses</u>:

Those of ordinary skill in the art know that balloon/dilatation catheters have myriad uses.  For example, U.S. Patent No. 5,290,306, "Puncture Resistant Balloon Catheter" to Trotta *et al.*, was filed on November 29, 1989, and assigned to Cordis Corporation.  This patent, cited in the prosecution of the '173 patent, states that

> ***Balloon catheters are well-known devices in which the catheter carries an inflatable balloon*** to occlude and seal a body space, to expand a blood vessel through pressurized inflation of the balloon ***or for any other desired purpose which may typically, but not necessarily be a therapeutic purpose in the medical field***.

(Exh. I, Col. 1, lines 5-10; emphasis added.)

Likewise, U.S. Patent No. 5,308,325, "Retention Balloon for Percutaneous Catheter" to Quinn *et al.*, was also cited in the '173 patent prosecution and states that

> The present invention generally relates to catheters for placement within body vessels, cavities or organs such as angioplasty, gastrostomy, cystostony or jejunostony tubes in particular, to an improved inflatable retention member for anchoring or retaining a catheter within a body cavity, organ or vessel.

(Exh. J, Col. 1, lines 7-12.)  Gastrostomy, cystostony, and jejunostony procedures do not involve catheterization of blood vessels.  (Prior art cited in the prosecution is part of the intrinsic evidence.  *Phillips*, 415 F.3d at 1317.)

8.     <u>No disclaimer</u>:  The Applicant never distinguished any of the cited prior art based on its use outside of blood vessels.  Thus, even though there was catheter prior art cited that involved use in the urinary system (*see*, *e.g.*, McWhorter, U.S. Patent No. 3,543,759, and Patel, U.S. Patent No. 4,335,723, Exhs. K and L, respectively), such prior art was never distinguished for failure to disclose use in the vascular system.  The only distinctions with prior art concerned the capability to meet the elements of the claimed structures.  Accordingly, non-vascular usage was never disclaimed.

9

1    9.    <u>Kyphon's admissions:</u>  Kyphon alleges that a "balloon catheter" is limited to use in

2    blood vessels.  However, for years prior to this litigation, Kyphon itself described its products – which

3    are not used in blood vessels – as balloon catheters:

4

5                              .

6

7                                     *    *    *    *    *

8

9

10                                    *    *    *    *    *

11

12

13                                   *    *    *    *    *

14

15

16

17   **III.    THE '173 PATENT: "SPHERICAL SHAPE"**

18

| Medtronic | Kyphon |
|---|---|
| A sphere-like shape. | A shape that is spherical like a globe or a basketball. |

21        The dispute regarding the term "spherical shape" in the '173 patent is whether it is a sphere-like

22   shape as proposed by Medtronic or whether, as proposed by Kyphon, it is limited to a globe or a

23   basketball.

24        Medtronic seeks a claim construction that uses the ordinary language of the claim regarding the

25   term "spherical shape."  Kyphon again seeks to read a limitation into the claim.  Medtronic is correct

26   for the following four reasons:

27

28

1.      Claim language:  Because a catheter balloon must be attached as a sleeve at two points along the shaft, a person of ordinary skill in the art understands that a balloon that is a "spherical shape" cannot be a perfect, three-dimensional sphere.  Accordingly, the ordinary and customary meaning of "spherical" is "sphere-like."  "Spherical" is even defined by Kyphon's own dictionaries in this manner:

> "spherical"      "1. having the form of a sphere *or one of its segments*" (Webster's 3rd New International Dictionary, Exh. N1; emphasis added); and

> "sphere"      "2. *any rounded body approximately of this form*; a globular mass."  (Random House Webster's Unabridged Dictionary, Exh. N2; emphasis added).

Kyphon's proposed construction attempts to limit a "spherical shape" to a globe, a basketball or a perfect sphere.  Such a construction is not in keeping with the heavy presumption in favor of the ordinary and customary meaning to be given to claim terms.

2.      It is improper to read limitations into the claims:  The words "globe" and "basketball" do not appear in the specification or the prosecution history and it is thus improper to read them into the claims.  *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 951 (Fed. Cir. 1993) (holding that it is error to add a wholly "extraneous" limitation to the claim).

If a limitation is not to be read into the claim from the specification, and the intrinsic evidence reveals no limitation on a general term like "spherical shape," it is certainly improper to read into the claim term limitations that appear nowhere in the intrinsic record.  *See, e.g. E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1368-1370 & n.5  (refusing to read in limitation from industry standards, objects of the invention, and prosecution history that contradict the plain meaning).

In fact, the only apparent basis for Kyphon's proposed construction is a recent Federal Circuit decision, *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005 (Fed. Cir. 2006), which involved completely different intrinsic evidence.  In *DePuy Spine*, the district court construed the term

11

"spherically-shaped" to mean "***approximately spherical***, such as a globe or a basketball." *Id.* at 1012 (emphasis added). The patent in the *DePuy Spine* action, however, related to pedicle screws and receiver members, not balloon catheters. *Id.* at 1010. Not content with the "*approximately* spherical" language from *DePuy Spine*, Kyphon further restricts the plain meaning of the term "spherical" by eliminating the word "approximately." Kyphon's proposed construction should be rejected.

       3.    <u>It is improper to exclude the preferred embodiment:</u> A claim interpretation that does not cover a preferred embodiment cannot be correct. *Dow Chemical Co. v. Sumitomo Chemical Co.*, 257 F.3d 1364, 1378. Here, the preferred embodiment is depicted in Figure 1[1] of the '173 patent:

# U.S. Patent No. 5,759,173 to Preissman - Fig. 1



The balloon in this figure is neither a globe nor a basketball. It is more of an oval or ellipsis that is in line with Kyphon's dictionary definitions (*i.e.*, a segment of a sphere or a rounded body). Since Figure 1 represents the preferred embodiment (*see*, Exh. A, Col. 4, lines 56-57), Kyphon's interpretation cannot be correct because Kyphon's interpretation would not cover Figure 1.

---

[1]    In order to focus the Court's attention on specific aspects of the figures, the figures in this memorandum have been modified in that many of the numbers and/or words appearing in the original figures have been removed and language identifying relevant features has been added.

1     4.     Prosecution:  The applicant did not limit the term "spherical" during prosecution to a

2 globe or basketball shape.  During prosecution, the claims were rejected under § 102(b) based on U.S.

3 Patent No. 5,250,069 to Nobuyoshi. (Exh. O.)  The Nobuyoshi patent disclosed a cylindrical balloon

4 catheter for use in dilating a stricture in a blood vessel.  The applicant overcame the Nobuyoshi

5 reference by arguing that Nobuyoshi's *cylindrical* expansible member was not equivalent to the

6 claimed spherical member and, thus, did not provide the same performance advantages:

7
8          The distal end of the catheter has a ***spherical expansible member (Fig.
           1)*** for slowing or stopping fluid flow in the vasculature through minimal
9          contact with the walls of the vasculature.

10                                    *   *   *   *   *

11
          In particular operations of the present catheter, such as aneurysm repair,
12         we wish to slow or stop fluid flow with minimal mechanical disruption
          to the wall of the vasculature [i.e., minimal contact].  The ***spherical
13         shaped*** balloon can occlude the vessel with only tangential contact of the
          balloon with the vessel wall.  A ***cylindrical balloon*** risks excessive
14         disturbance of the vessel wall, which is particularly undesirable when the
          procedure involves the thinned blood vessel walls associated with an
15         aneurysm.

16 (Exh. A2, July 9, 1997 Amendment, at 2, 4; emphasis added.)

17     Thus, the applicant distinguished the claims from the Nobuyoshi "cylindrical balloon" on the

18 grounds that the claimed balloon was "spherical," not a globe or basketball.  Indeed, the applicant

19 expressly pointed the Examiner to Figure 1 of the '173 patent, in which the depiction of the claimed

20 balloon is an oval or elliptical shape, *i.e.*, a "sphere-like" shape.

21
22 **IV.    THE CLAIM TERMS IN THE '349 PATENT
          ARE CLEAR FROM THE CLAIM LANGUAGE.**

23
24     The invention in claim 1 of the '349 patent provided the doctor with a new tool – a catheter

25 with a *reduced profile* at its distal (front) end, allowing for access to narrower pathways.  Indeed, claim

26 1 requires two elements for such a reduced profile:  (1) "the distal segment of the shaft being smaller in

27
28

                                          13

diameter than the proximal segment of the shaft;" and (2) "the sleeve having an integral enlarged diameter balloon portion … both the sleeve and balloon being collapsible about the shaft."

While the claim language is clear on its face, Kyphon impermissibly tries to read limitations from the preferred embodiments described in the specification into the claim. The claim terms should be accorded their plain and ordinary meaning as proposed by Medtronic.

**A.    "sleeve"**

| Medtronic | Kyphon |
|---|---|
| A structure that fits over another. | A tubular piece fitting over a rod or the like. |

There is no dimensional limitation to "sleeve," notwithstanding Kyphon's argument that the claimed "sleeve" must be tubular.

1.    <u>Claim language</u>: As described in claim 1, the "sleeve" has nine elements, none of which require a tubular shape:

> A dilatation catheter comprising:
>
> an elongated flexible shaft having a proximal segment and a distal segment, the distal segment of the shaft being smaller in diameter than the proximal segment of the shaft;
>
> the proximal segment having an inflation lumen extending therethrough;
>
> a sleeve [1] extending over the distal segment of the shaft, [2] the proximal end of the sleeve being attached to the shaft and [3] being in communication with the inflation lumen;
>
> [4] the distal end of the sleeve being attached to the distal end of the shaft;
>
> [5] the sleeve having an integral enlarged diameter balloon portion, [6] both the balloon and the sleeve being formed from a thin walled, flexible material and [7] being inflatable and deflatable, [8] both the sleeve and balloon being collapsible about the shaft in response to a negative pressure applied to the inflation lumen,
>
> [9] whereby the diameter of the catheter in the region of the sleeve may be made to conform closely to the smaller reduced diameter of the distal segment of the shaft.

Because none of the claim elements requires the sleeve to be "tubular," there is no basis for such a limitation.

2. <u>Kyphon's interpretation contradicts the claim language:</u>  The sleeve, as claimed in claim 1, has "an integral enlarged diameter balloon portion."  A balloon portion is not a tube.  Thus, the plain language of the claim makes it clear that the sleeve has a portion that is ***not*** necessarily tubular:  the balloon portion.

3. <u>It is improper to read a limitation into the claims:</u>  It is beyond dispute that reading a limitation into the claims from the specification is improper.  *Teleflex*, 299 F.3d at 1327-28.  The specification uses the term "sleeve" 47 times.  In only one instance is the sleeve referred to as "tubular."  (*See* Exh. B, Col. 3, lines 42-48.)  The fact that one object of the invention discusses a tubular sleeve does not mean that that particular feature is to be adopted as a limitation in each claim of the patent.  *See Yoon Ja Kim v. Conagra Foods, Inc.,* 465 F.3d 1312, 1319 (Fed. Cir. 2006).  This makes it clear that a "sleeve" is not necessarily tubular and no such limitation should be added unless it is expressly required by the claims.  The absence of the adjective "tubular" in the claims necessarily results in a sleeve that need not have any specific shape.

4. <u>Dictionary:</u>  Kyphon's sole support for its "tubular" position is one definition in a general purpose dictionary.  Other dictionaries define "sleeve" without such limitation ("an encasement into which an object or device fits;" Exh. P, *The American Heritage Dictionary*, 1991).  Such non-medical extrinsic evidence simply cannot outweigh the intrinsic evidence as dictionaries are less significant in determining the meaning of the claim term.  *Phillips*, 415 F.3d at 1317.

**B.**     <u>**"balloon portion"/"balloon"**</u>

| Medtronic | Kyphon |
|---|---|
| The part of the sleeve with an enlarged diameter. | A portion of the sleeve having an enlarged diameter relative to the rest of the sleeve.  The balloon is formed integrally with, but is distinct from, the rest of the sleeve. |

The dispute here is whether the balloon portion must be a separate element that is "distinct from the rest of the sleeve." It is clear that the claim requires no such limitation.

1.    <u>Claim language:</u>  The plain meaning of the words of the claim require that the balloon portion be part of the sleeve. Claim 1 requires "the proximal end of the sleeve being attached to the shaft" and "the distal end of the sleeve being attached to the distal end of the shaft." Thus, the ends of the sleeve – not the integral balloon portion of the sleeve – are attached to the shaft. The integral balloon portion must lie in the middle of the sleeve between the proximal and distal ends. The integral balloon portion is a part of the sleeve, not a distinct segment. The shaft in claim 1 is separated into two distinct "segments." The sleeve and balloon, however, are not "segmented" in this manner. Rather, the claims merely require that the balloon be a "portion" of the sleeve.

2.    <u>Kyphon's interpretation contradicts the claim language:</u>  Claim 1 states, "the sleeve having an ***integral*** enlarged diameter balloon portion." *See, e.g.*, *Dorel Juvenile Group, Inc. v. Graco Children's Prods.*, 429 F.3d 1043, 1045, 1048 (Fed. Cir. 2005) (indicating that "integral" is construed to mean one single structure) (emphasis added); *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1371, 1373 (Fed. Cir. 2000) (affirming district court claim construction that ordinary meaning of "integral" is formed as a unit with another part). As such, the balloon portion is part of the sleeve, *i.e.*, integral with, not distinct from, the sleeve.

3.    <u>Claim drafting parlance:</u>  The claim introduces the integral balloon ***portion*** as a portion of the sleeve, rather than a separate distinct balloon. After introducing "***a*** balloon portion," the claim later refers to "***the*** balloon" (emphasis added). The word "a" provides antecedent basis. *See Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F.Supp.2d 423, 458 (S.D. N.Y. 2002) (stating "the term 'micro-environment' is preceded by the word 'the.' The use of this definite article mandates that the term 'micro-environment' was previously used…"); *See also Zenith Electronics Corp. v. Exzec, Inc.*, No. 93 C 5041, 1995 WL 275591 at *5 (N.D. Ill. May 8, 1995) (stating "[a]n indefinite article ('a' or 'an') is

used to introduce an element.  A definite article ('the' or 'said') is used when a term has already been introduced, thereby making mention of the earlier recitation of the element."); Exh. Q, *Manual of Patent Examining Procedure*, § 2173.05(e), 2100-218 (8th ed. 5th rev. 2006).  Accordingly, "***the*** balloon" clearly refers to the integral balloon ***portion***.  Kyphon's interpretation depends on a separate balloon which requires impermissibly reading a limitation into the claim not found in the claim language itself.  Indeed, Kyphon's position contradicts the "balloon portion" claim language.

4.     Specification:  The specification also supports Medtronic's position that the sleeve and balloon are a single integrated part of the catheter.  For example, the specification states, "In the preferred embodiment of the invention, the sleeve 24 and balloon 28 are formed in a ***single integral piece*** from polyethylene terephthalate (PET)."  (Exh. B, Col. 5, lines 58-61 (emphasis added); *see also* Col. 5, lines 7-8.)  One should not construe a claim to read out the preferred embodiment.  *Dow Chemical Co.*, 257 at 1378.  Here the preferred embodiment clearly states that the sleeve and balloon are a single integral piece.

C.     **"both the sleeve and balloon being collapsible about the shaft"**

| Medtronic | Kyphon |
|---|---|
| The sleeve – including the "integral enlarged diameter balloon portion" – is capable of folding down around the shaft into a reduced profile. | Both the sleeve and balloon collapse about the shaft when deflated.  A sleeve having a wall thickness of 0.0045 inches or more is not collapsible in the manner of the invention. |

The dispute here is whether a "collapsible" sleeve must have a specific thickness.  Medtronic asserts that the sleeve must be "collapsible" regardless of its dimensions.  Kyphon responds that no sleeve with a wall thickness greater than 0.0045 inches can be collapsible.  Medtronic is correct for at least four reasons:

1.     Claim language:  The words of the claim are clear:  the sleeve and balloon must be "collapsible about the shaft" to meet this limitation.  There is no limitation as to the dimension of the sleeve and balloon.  The only limitation is the ability to collapse.  *Innova/Pure Water, Inc. v. Safari*

17

*Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("… a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point out and distinctly claim the subject matter which the patentee regards as his invention.") (modifications omitted).

2.    <u>Claim differentiation</u>:   Claim 19 depends on claim 1 and adds a limitation on the thickness of the sleeve:  "wherein the wall thickness of the sleeve and the balloon is no greater than about 0.0005" thick."   Because this dependent claim adds a limitation not present in the independent claim, the doctrine of claim differentiation makes clear that there is no required wall thickness in claim 1.  *RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255, 1264 (Fed. Cir. 2003).

3.    <u>Specification</u>:   The specification does not require that the sleeve and balloon be of a certain dimension.  Although the specification discloses a preferred embodiment, there is no language disclaiming collapsibility based on a certain thickness.

4.    <u>Prosecution</u>:   During prosecution, the applicant established that the Pope patent did not disclose the elements of a reduced profile catheter:  (1) the smaller distal segment of the shaft, and (2) a collapsible sleeve.  (Exh. R; Exh. B2 at 6:  "[n]one of the cited patents relates to a catheter having the combination of [1] the shaft and [2] collapsible sleeve called for by the claims.")  Because these two aspects of claim 1 result in the invention – a reduced profile – the Pope patent was distinguished.

The applicant also observed that the Pope sleeve actually could not collapse because of its relative thickness.  ("Moreover, it is apparent from the Pope '378 patent that the thickness of the tube 12 is very substantial.  Note in col. 2, line 66 to col. 3, line 2, a statement of the inner and outer diameters of the tubular catheter 12 from which it may be determined that the wall thickness of the tube is 0.0045 inches.  Such a catheter would not collapse in the manner of applicant's invention." *See* Exh. B2 at 7).  Based solely on this peripheral observation by the applicant, Kyphon now argues that the claim term "collapsible" is limited to sleeves less than 0.0045 inches thick.

1    To limit a claim term, there must be a "clear disavowal of claim scope" in the prosecution.

2    *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324-25 (Fed. Cir. 2002).  However,

3    this peripheral statement in no way was a disavowal of claim scope as required by the Federal Circuit.

4    *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1360-61 (Fed. Cir. 2003).  First, the applicant did

5    not amend the claim to include a thickness limitation.  *Innova/Pure Water*, 381 F.3d at 116.  Second,

6    the applicant's observation focused solely on the Pope sleeve, and was therefore relative only to the

7    overall dimensions of the Pope sleeve.  Indeed, a large sleeve with a larger thickness could be

8    collapsible while a smaller sleeve with a smaller thickness may not be collapsible.  There was simply

9    no broad disclaimer of any sleeves – large, small, or in between.  Thus, the law precludes Kyphon's

10   interpretation of a "collapsible" sleeve as one that has a wall thickness less than 0.0045 inches on the

11   ground that a distinguished reference happened to have such a dimension.

12   Moreover, one cannot read a limitation from a prior art specification into the claims.  *E-Pass*

13   *Techs.*, 343 F.3d at 1370 n.5.  Kyphon, using the Pope reference and in keeping with its trend of

14   reading limitations into the claims, is asking the Court to enter an actual wall thickness limitation of

15   0.0045 inches into the plain and clear claim language set forth above.  However, the claim language

16   merely states that both the sleeve and integral balloon portion must be able to collapse about the shaft.

17   No dimensional limitation is in the claim and none should be added.

**V.    THE CLAIM TERMS IN THE '191 AND '856 PATENTS
        ARE CLEAR FROM THE CLAIM LANGUAGE.**

22   The '191 and '856 patents are both directed to catheters that are sturdier than the prior art.

23   Specifically, these patents disclose catheters that resist "axial telescoping."  That is, when the distal

24   (front) end of the catheter comes in contact with an opposing force, the inner tube resists being pushed

25   inside the outer tube.  Such relative movement between the tubes is resisted through an attachment

26   between them.

The claim language of the '191 and '856 patents is clear on its face.  Additionally, the prosecution history provides significant guidance.  Examiner Michael Thaler, who reviewed these claims over the entire 12 years of prosecution, expressly defined many of the terms in dispute.  The applicant did not always agree with Examiner Thaler, providing a record where the definitions of these terms were the subject of repeated discussion.  As a result, a person of ordinary skill in the art who reviews the entire prosecution history in context will have no doubt as to the proper interpretations.  *See Phillips*, 415 F.3d at 1313, *citing Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term … in a vacuum.  Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history").

Again, Medtronic's interpretations are based on the claim language and the prosecution history, while Kyphon's interpretations import non-existent limitations into the claims and contradict the claim language and prosecution history.

**A.    "catheter shaft" ('191 patent/'856 patent)**

| Medtronic | Kyphon |
|---|---|
| The body of the catheter including the Y-fitting. | The portion of the catheter distal to the Y-fitting (or equivalent thereof) formed from the inner tube and the coaxial outer tube. |

The dispute here is whether the Y-fitting is part of the catheter shaft.  It is, for the following four reasons.

1.    Claim language:  The asserted claims state that the catheter shaft is made up of the inner tube and the outer tube.  For example, claim 1 of the '191 patent reads

A two tube, two lumen coaxial balloon dilatation catheter comprising:

an elongate, flexible ***catheter shaft*** having a proximal region, a proximal end and a distal end,

*wherein the shaft is formed from*

[1]    *an **inner tube** defining a guidewire lumen therethrough, and*

[2] *a surrounding **outer tube***

  [a] *coaxial with the inner tube and*

  [b] *defining an annular inflation lumen therebetween,*

the inner tube being of smaller diameter than the outer tube and having a distal end region extending distally of the distal end of the outer tube …

(emphasis added).

Thus, the claimed catheter shaft is formed from the coaxial inner and outer tubes having an inflation lumen, or space, defined between them.  The claims do ***not*** require that each tube be integral, made of only one piece, or made of a specific material or the same material.  Thus, each tube can be made up of more than one piece and in catheters where such inner and outer tubes are present in a Y-fitting, the catheter shaft necessarily must include the Y-fitting.

  2. <u>Specification:</u>  Under "Summary of the Invention," the common specifications state that

The invention is embodied in a coaxial type of PTCA catheter in which the elongate catheter shaft is formed from an inner tube and a coaxial outer tube.  The inner tube extends from the proximal end fully to the distal end of the catheter and terminates in an open distal outlet.

(Exh. C, Col. 2, lines 20-25.)  The specification defines the "proximal end" of the catheter as 12, which has a Y-fitting 26.  (*See id.* at Col. 3, line 31):

## U.S. Patent No. 5,759,191 - Fig. 1



The specification uses the term "proximal" in a manner consistent with the plain and ordinary meaning, namely, the end **nearest** the doctor.  *See* Section IV.B.  The specification further states that "the outer tube extends from the proximal end of the catheter."  (*Id.* at Col. 2, lines 27-29.)  Indeed, according to Figure 1, the inner and outer tubes extend through the Y-fitting.  Thus, the Y-fitting contains both the inner tube and the outer tube and must be included in the definition of "catheter shaft" in the specification.

3.    Prosecution:  Examiner Thaler removed any doubt regarding "catheter shaft" when he expressly defined the "catheter shaft" as *including the Y-fitting* in the prior art Simpson patent. (Exh. S.)  On May 10, 1994, Examiner Thaler cited to Figure 3 of the Simpson patent when making an anticipation rejection and stated that "the proximal end of the catheter shaft is at the extreme left end of the catheter as seen in Fig. 3."  (Exh. C5 at 2-3.)  Figure 3 **only** depicts a Y-fitting:

**U.S. Patent No. 4,323,071 to Simpson et al. - Fig. 3**



Importantly, the rejected claims did not include the term "catheter shaft" at the time.  In response to the rejection, the applicant amended the pending claims, adding the term "catheter shaft" in the amendment.  (Exh. C4, November 14, 1994 Amendment at 1-2.)  Thus, according to the plain and ordinary meaning and the Examiner's definition in the prosecution history, it is clear that the claimed

"catheter shaft" includes the Y-fitting.  *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1328-29 (Fed. Cir. 2001) (using prior art figures for claim construction when applicants amended in response to that prior art); *see also Torpharm, Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) (public is apprised of the scope of the claim based on applicant's amendment in response to rejection).

4.      It is improper to read limitations into the claims:  Kyphon again tries to read in a claim limitation where one is not present.  There is *no* language in either the claims or the specification that provides that the catheter shaft is distinct from the Y-fitting.  Hence, this unsupported claim limitation should not be included in the claim construction.  *See, e.g., K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) (holding that the term "permanently affixed" could not be construed to only preclude movement in a horizontal direction because "[c]ourts do not rewrite claims").  If the Y-fitting meets the claimed criteria for the "catheter shaft" – which it does – then there is no basis to exclude it from the interpretation of "catheter shaft."

B.      **"proximal region" ('191 patent/'856 patent)**

| Medtronic | Kyphon |
| --- | --- |
| The very small area adjacent the proximal end of the catheter shaft. | The region of the catheter shaft distal to the Y-fitting (or equivalent thereof) and extending from the proximal end of the catheter shaft to the distal region of the catheter shaft. |

The dispute concerning "proximal region" involves the location of the attachment between the inner and outer tubes.  An attachment comes within the scope of the claims-in-suit if it meets a functional requirement and a location requirement.  The functional requirement ("to resist axial telescoping") is not in dispute.  The parties do, however, dispute the required location of the attachment:

the outer tube being attached to the inner tube at a location *between*

[a] the *proximal region* of the catheter shaft and

[b] said distal connection ....

23

(Emphasis added.)  Kyphon's interpretation of "proximal region" appears to include the Y-fitting as part of the catheter shaft.

The '191 and '856 patents, as in most catheter patents, use the terms "proximal" and "distal" to describe the two ends of the catheter.  The end closest to the doctor during surgery is the "proximal" end, whereas the end furthest from the doctor is the "distal" end.  This is the ordinary and clear meaning of these terms.  This usage is also consistent with the dictionary definitions of the terms:

- proximal:  "lying very near or close to something."  (Exh. T.)  In this case, very near the doctor performing the surgery.

- distal:  "situated away from the center of the body or from the point of origin (said of the extremity or distant part of a limb or organ)."  (Exh. U.)  Here, the distant part of the catheter, as far away from the doctor as possible.

The parties agree that the "proximal region" begins at the proximal end of the catheter shaft.  The dispute centers on how far the proximal region extends along the shaft.

Medtronic's position:  The proximal region is *the very small area adjacent the proximal end of the catheter shaft*.  As such, the attachment must be located between this small area adjacent the proximal end and the distal connection. Thus, the attachment may occur anywhere along most of the length of the shaft.



Kyphon's position:  Kyphon alleges that the proximal region *extends all the way to the distal*

*region.*  As mentioned above, the attachment must be located "*between* [1] the proximal region of the catheter shaft and [2] said distal connection."  According to Kyphon's interpretation, the proximal region is adjacent to the distal region.  Thus, under Kyphon's interpretation, the claimed attachment must be located in the distal region of the shaft.

## Kyphon's Interpretation of "proximal region"



Medtronic is correct for the following five reasons:

1.   <u>Claim language</u>:  The plain and ordinary meaning of the language of the claims is clear on its face.  One border for the attachment location, the "proximal region," is the area at one end ("the proximal end") of the shaft.  The other border, the "distal connection," is at the other end ("the distal end").

Kyphon alleges, however, that the "proximal region" extends all the way to the distal region, resulting in a proximal region that extends beyond the center of the shaft.  That interpretation contradicts the words of the claim and must thus be rejected.  *RF Delaware, Inc.*, 326 F.3d at 1263-64 (refusing to construe claim in a manner that "conflicts ... directly with the claim language").

2.   <u>Kyphon cannot rewrite the claim language</u>:  Under Kyphon's interpretation, the location of the attachment must be in the distal region.  The claim language, however, does not state that the attachment is "in the distal region."  Instead, it says that the attachment is "*at a location between the proximal region of the catheter shaft and said distal connection*."  Kyphon seeks to rewrite the claim

language in a way that removes these 15 words and simply says "distal region."  However, the claims

state otherwise.

3.   <u>Specification:</u>  The term "proximal region" does not appear in the specification.  It was

added to the claims during prosecution.  However, the term "proximal" in the specification always

describes the end closest to the doctor and not the central portion.  For example, in describing the

length of the balloon, the specification makes clear that "proximal" and "distal" are the extreme ends

with a central section in between:

> The balloon typically includes proximal and distal cone sections 48, 50
> and a central cylindrical section 52, as will be appreciated by those
> skilled in the art.

(Exh. C, Col. 4, lines 29-31.)

This same geography applies to the catheter shaft.  The proximal region does not extend to the

distal region.  Instead, there is a central section in between.

4.   <u>Prosecution history</u>:  To the extent there is any doubt concerning the proper

interpretation of "proximal region," it is resolved by the prosecution history.  The term "proximal

region" was at issue in numerous documents submitted by the applicant and Examiner Thaler over the

12 years of the combined prosecution.  Examiner Thaler expressly defined the proximal region as "at

the extreme proximal end," "a miniscule sliver," and "adjacent the proximal end."

It is noteworthy that once the term "proximal region" was added to the claims, its definition

was vigorously debated and even though Examiner Thaler's definition prevailed, the applicant never

removed the term.  Because "proximal region" is defined in the prosecution history, the public is well

aware of its proper interpretation.  *See Phillips*, 415 F.3d at 1317 ("the prosecution history provides

evidence of how the PTO and the inventor understood the patent."); *Inverness Med. Switz. GmbH v.*

*Princeton Biomeditech Corp.*, 309 F.3d 1365, 1372 (Fed. Cir. 2002).

a.    The Simpson reference:  On November 14, 1994, the applicant amended claim 1 to require that the attachment be located "between the proximal region of the catheter shaft and said distal connection." (Exh. C4 at 2.)  The applicant unsuccessfully argued that the amendment "necessarily distinguishes over Simpson where the connection referred to by the examiner (via side arm 76) is at the proximal region of the catheter." (*Id.* at 10-11.)  The applicant also expressly disagreed with the Examiner's conclusion that the Simpson attachment "inherently resists axial telescoping." (*Id.* at 11.)  Examiner Thaler found the applicant's arguments unpersuasive and, in fact, expressly rejected the argument: "Applicant's arguments filed Nov. 14, 1994 have been fully considered but they are not deemed to be persuasive." (Exh. C6 at 3.)  That is, the Examiner recognized that the attachment in Simpson fell between the proximal region and the distal connection.

b.    The Board of Appeals decision:  On appeal to the Board of Patent Appeals and Interferences, the Board disagreed only with the Examiner's conclusion that the Simpson attachment performed the required function to resist axial telescoping.  After quoting claim 1 in its entirety, the Board stated that "Simpson does not disclose an outer tube … being attached to an inner tube at a location *between the proximal and distal ends of the catheter* to resist axial telescoping of the inner tube with respect to the outer tube, as required by independent claim 1." (Exh. C7 at 5; emphasis added.)

c.    The Yock reference:  That interpretation was subsequently confirmed during the prosecution of the '856 continuation patent application, in which Examiner Thaler clearly and expressly defined the "proximal region" as *the very small area adjacent the proximal end.*  Figure 1 of the Yock patent (Exh. V) is presented below:

## U.S. Patent No. 5,061,273 to Yock - Fig. 1



**Proximal region of the catheter shaft**

During the `856 prosecution, the Examiner rejected the claims in view of a prior art patent to Yock. Examiner Thaler stated, "Yock shows a catheter shaft 29 … having ***a proximal region*** (the portion of tube 29 ***adjacent to fitting 32***)." (Exh. D2 at 3, emphasis added; *see also* Exh. D3 at 2.) Later in the prosecution, Examiner Thaler referred to the "proximal region" as "***the extreme proximal end***." (Exh. D4 at 4; emphasis added.) Such statements leave no doubt that the "proximal region" is the small area adjacent the proximal end.

    d.    The interview: On June 26, 2000, five days after an interview, the applicant amended the claims to overcome Yock. In the Amendment, the applicant commented that Examiner Thaler had stated that "***a minuscule sliver*** of the attachment could be considered a 'proximal region.'" (Exh. D5 at 7; emphasis added.) Thus, Examiner Thaler expressly defined, and the applicant understood, the "proximal region" as a very small area, even "minuscule."

    e.    The applicant's acknowledgement: Although the applicant did not always agree with Examiner Thaler's interpretation, the applicant never modified the "proximal region" language in the claims, never amended "proximal region" to "region adjacent the distal region" or "middle region", and eventually acquiesced to the Examiner's interpretation. In view of Examiner Thaler's express

definition during prosecution of the '856 patent, there can be no dispute regarding the proper

interpretation of "proximal region."  Thus, the term "proximal region of the catheter shaft" is *the very*

*small area adjacent the proximal end of the catheter shaft.*"

*Inverness*, 309 F.3d at 1373, is particularly relevant.  The applicant made certain statements that

were rejected by the examiner, who allowed the claims for reasons different than the applicant's

statements.  In such cases, the applicant's statements are not controlling.

Kyphon suggests that *Springs Window Fashions LP v. Novo Indus. LP*, 323 F.3d 989, 993-94

(Fed. Cir. 2003) controls here.  However, in *Springs Windows*, the examiner, in allowing the claims,

relied on and adopted the applicant's position, even though it was not the basis for allowance.  *Id*. at

993-94.  In such a case, the applicant cannot withdraw its prior statements.  The facts here are

different:  the examiner rejected and refused to adopt the applicant's position.  The contrary position

was the basis for the allowance.  There is no law suggesting that a rejected argument could control the

claim interpretation.

**C.**     **"guidewire lumen" ('191 patent/'856 patent)**

| Medtronic | Kyphon |
|---|---|
| The passage of the inner tube. | An opening through the catheter shaft for passage of the guidewire over which the catheter is advanced. |

Both parties agree that the guidewire lumen is formed by the inner tube of the catheter shaft.

The dispute concerns whether the catheter must be advanced over a guidewire.  It need not for the

following reasons.

1.     Claim language:  Again, the clear claim language supports Medtronic's definition of the

"guidewire lumen":  "wherein the shaft is formed from an inner tube defining a guidewire lumen

therethrough."  Thus, the inside of the inner tube is the "guidewire lumen."  A guidewire is not claimed

and therefore is not a limitation of the asserted claims.

2.     It is improper to add limitations into the claims:  The claims do not require a guidewire. Instead, only a guidewire lumen is required.  Thus, from the plain language of the claims, Kyphon's position fails because there is no guidewire over which to be advanced.  Kyphon's attempt to add a term is impermissible.  *See*, *e.g.*, *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001) (improper to read in a functional limitation when the claim is written in purely structural terms).

3.     Apparatus claim:  The asserted claims are apparatus claims and as such, Kyphon's requirement of advancing the catheter in a particular manner (over a guidewire) fails.  What matters is the structure claimed, not an allegedly intended use.  *Brookhill-Wilk 1, LLC*, 334 F.3d at 1301 ("Absent a clear disclaimer of particular subject matter, the fact that the inventor anticipated that the subject matter may be used in a particular manner does not limit the scope to that narrow context.")

**D.     "means for communicating the annular inflation lumen with the interior of the balloon to facilitate inflation and deflation of the balloon, the inflation lumen comprising the sole lumen in communication with the interior of the balloon" ('191 patent)**

| Medtronic | Kyphon |
|---|---|
| An opening associated with the outer tube within the balloon, which together with the inner tube defines the sole inflation lumen in communication with the interior of the balloon, for allowing inflation and deflation of the balloon.<br><br>*[If this element is interpreted under 35 U.S.C. § 112(6), the* <u>*function*</u> *recited is "communicating the annular inflation lumen with the interior of the balloon to facilitate inflation and deflation of the balloon."  The* <u>*structure*</u> *disclosed in the specification for performing this recited function is an opening at the distal end of the outer tube within the balloon, and equivalents thereof.]* | Should be construed under 35 U.S.C. § 112(6). The function performed is communicating the annular inflation lumen with the interior of the balloon.  The corresponding structure is a pair of circumferentially spaced apertures formed in the wall of the outer tube within the balloon. |

The parties dispute whether this term, found in claim 1 of the '191 patent, is a means-plus-function element.  The term is merely an opening associated with the outer tube.

1         1.    <u>Mean-plus-function</u>:  Use of the word "means" in a claim creates a rebuttable presumption that the drafter intended the term to be construed in accordance with 35 U.S.C. § 112 ¶ 6, which provides that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427 (Fed. Cir. 1997).

        This presumption may be overcome if the claim recites sufficiently definite structure to perform the recited function, taking the term out of § 112 ¶ 6. *Id.*  The structure may be either explicit or implicit in the claim language. *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996) (explicit structure); *Watts v. XL Sys., Inc.*, 232 F.3d 877, 881 (Fed. Cir. 2001) (implicit structure).

        There is sufficient structure in the claim language to remove the term from a means-plus-function analysis.  Here, the function to be performed is "communicating the annular inflation lumen with the interior of the balloon to facilitate inflation and deflation of the balloon."  Because the claim provides sufficient structure to allow the annular inflation lumen to "communicate" with the interior of the balloon in order to inflate and deflate, the "means for communicating" is ***not*** to be interpreted as a means-plus-function term.

        The claim language provides an inner tube, an outer tube and an inflation lumen between the two tubes:

> an elongate flexible catheter shaft having a proximal region, a proximal end and a distal end, wherein the shaft is formed from an inner tube defining a guidewire lumen therethrough, and a surrounding outer tube coaxial with the inner tube and ***defining an annular inflation lumen therebetween*** ….

1   (Emphasis added; *see also* Exh. W, *The Oxford English Dictionary Volume IX 97* (2nd ed. 1989)

2   (lumen: "1. An opening, passage, or canal….c. *Surg*. The passage of any tool in an instrument.")

3   (emphasis added).)

4        The claim language also provides for a balloon whose proximal end is attached to the distal

5   region of the outer tube:

6

7        an ***inflatable dilatation balloon*** having a proximal end and a distal end,
         the proximal end of the balloon being attached to the distal region of the

8        outer tube …. (Emphasis added.)

9        Finally, the claim language provides for a means for the inflation lumen to "communicate" with

10  the interior of the balloon, where the inflation lumen is the only source for the interior of the balloon:

11

12       means for communicating the annular inflation lumen with the interior of
         the balloon to facilitate inflation and deflation of the balloon, ***the***

13       ***inflation lumen comprising the sole lumen in communication with the***
         ***interior of the balloon*** …. (Emphasis added.)

14       Because "the inflation lumen compris[es] the sole lumen in communication with the interior of

15  the balloon," the only way that the inflation lumen can "communicate" with the balloon so that the

16  balloon is inflated and deflated is through *an opening* in the tube.  Accordingly, the **structure** for

17  accomplishing such communication is simply an opening associated with the distal part of the outer

18  tube.  (This is clear since a "tube" by its very nature has openings at both ends.)  Thus, the claim

19  language provides sufficient structure (an opening in the outer tube) so that this term should not be

20  interpreted as a means-plus-function element under § 112 ¶ 6.  *Envirco Corp. v. Clestra Cleanroom,*

21  *Inc.*, 209 F.3d 1360, 1365 (Fed. Cir. 2000).  There can be no dispute that an "opening" is structure

22  since Kyphon also proposes that the "means for communicating" should be interpreted as an opening

23  (or "aperture").  Indeed, courts have determined that an opening is sufficient structure to remove a term

24  from means-plus-function consideration.  *See ASM America, Inc., et al. v. Genus, Inc.*, 260 F.Supp.2d

25  827, 863 (the "aperture" by itself was sufficient structure for performing the claimed function, thus

26  removing the term from means-plus-function consideration.).

27

28

2.    <u>Other claims</u>:  Claim 3 of the '191 patent more specifically defines the "means for communicating" element:

> A catheter as defined in claim 2 wherein the means for communicating the inflation lumen with the interior of the balloon comprises at least one aperture associated with the outer tube for communicating the inflation lumen with the interior of the balloon.

According to claim 3, the "means for communicating" element is merely an aperture (opening) associated with the outer tube.  Claim 2 depends on claim 1.  Thus, claim 3 depends on claim 1 through double dependency.  Since claim 3 is a subset of claims 2 and 1, claim 1 must have a broader scope than "at least one aperture associated with the outer tube."  *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003).  Kyphon's construction of claim 1 would require the independent claim to be *narrower* (two apertures) than its dependent claim (at least one aperture).  Such a construction cannot be correct.

Likewise, claim 9 of the '856 patent describes the identical feature in the following manner: "wherein a portion of the outer tube is disposed within the balloon and wherein the at least one aperture is formed in the portion of the outer tube that is disposed within the balloon."  (This term, also in dispute, is discussed in Section VI.F.)  Kyphon defines this term as:

> At least ***one opening in*** either [1] the wall of the outer tube or [2] ***a structure associated with the outer tube*** to allow for inflation and deflation of the balloon. (Emphasis added.)

Clearly, an "opening in … a structure associated with the outer tube" includes an opening at the distal end of the tube.  Because an "aperture" is merely an opening, the use of the same language and concepts should result in the same interpretation for both claim elements.

3.    <u>Prosecution</u>:  The prosecution history likewise makes clear that the "means for communicating" is an opening at the distal end of the outer tube.  On February 16, 1999, Examiner Thaler rejected the pending claims in view of the Yock patent, stating that "Yock shows … means (***the opening at the end of the annular inflation lumen 41***) for communicating the annular inflation lumen

33

41 with an interior of the balloon."  (Exh. D2 at February 16, 1999 Office Action at 3-4; emphasis added.)  The "means for communicating" was the opening at the distal end of the outer tube listed as "41," as seen in Figure 3A of Yock:

**U.S. Patent No. 5,061,273 to Yock - Fig. 3A**



The applicant implicitly agreed with Examiner Thaler's definition and was able to successfully distinguish Yock on other grounds.  (*See* Exh. D6 at May 24, 1999 Amendment and Reply at 9-10; *see also* Exh. D3 at January 3, 2000 Office Action at 2.)  Thus, in the context of the prosecution history, the "means for communicating" is an opening associated with the outer tube.

E.   **"means at the proximal end of the catheter for accessing**
   **• each of the guidewire and inflation lumens" ('191 patent)**
   **• the inflation lumen" ('856 patent)**

| Medtronic | Kyphon |
|---|---|
| The openings at the proximal end of the catheter allowing for access to the guidewire and inflation lumens.<br><br>*[If this element is interpreted under 35 U.S.C. § 112(6), the <u>function</u> recited is "accessing each of the guidewire and inflation lumens." The <u>structure</u> disclosed in the specification for performing the recited function is the openings at the proximal end of the Y-fitting for accessing the guidewire and inflation lumens, and equivalents thereof.]* | Should be construed under 35 U.S.C. § 112(6). The function performed is accessing each of the guidewire and inflation lumens. The corresponding structure is a Y-fitting and a pair of flexible proximal tubes, one of the proximal tubes being in communication with the guidewire lumen and the other proximal tube being in communication with the annular inflation lumen, and fittings at the proximal ends of the proximal tubes by which appropriate fluid devices such as syringes, inflation devices or the like may be connected. |

As with the "means for communicating," the parties dispute whether this term is a means-plus-function element. Medtronic asserts that "means ... for accessing" should be interpreted as the openings at the proximal end of the catheter to access the guidewire and inflation lumens. Kyphon proposes that it must be a Y-fitting and a pair of proximal tubes. (The term in the '191 patent includes both the guidewire and inflation lumens, while the term in the '856 patent includes only the inflation lumen. Medtronic's analysis focuses on claim 1 of the '191 patent since it includes both lumens.) Again, the claim language is clear on its face, and the prosecution history confirms that Medtronic is correct.

1.   Means-plus-function: There is sufficient structure in the claim language to remove the term from a means-plus-function analysis. The function to be performed is "accessing each of the guidewire and inflation lumens." Because the claim provides sufficient structure to allow the lumens to be accessed, the "means ... for accessing" is not to be interpreted as a means-plus-function term. *Sage Prods.*, 126 F.3d at 1427-28.

The claim language provides for a catheter shaft with a proximal end that is formed from an inner tube and an outer tube.  Additionally, a guidewire lumen is inside the inner tube and an inflation lumen is inside the outer tube:

> *an elongate flexible catheter shaft* having a proximal region, *a proximal end* and a distal end, wherein the shaft is formed from *an inner tube defining a guidewire lumen therethrough* and *a surrounding outer tube* coaxial with the inner tube and *defining an annular inflation lumen therebetween* ….  (Emphasis added.)

The claim also provides for the proximal end of the catheter to provide access:

> means *at the proximal end of the catheter* for accessing each of the guidewire and inflation lumens.  (Emphasis added.)

Both "lumens" at issue are the area inside the tubes that, by definition, have openings at their proximal ends.

> lumen: "1. An opening, passage, or canal….c. *Surg*. The passage of any tool in an instrument."  *The Oxford English Dictionary Volume IX 97* (2nd ed. 1989).  (Exh. W.)

Thus, "accessing" a lumen is simply the act of entering each of the tubes at the proximal end.  Accordingly, the structure for accomplishing such an accessing function is simply an opening at the proximal end of each tube.  As mentioned above, the parties agree that an "opening" is a structure.  When, as here, the claim language provides sufficient structure (all tubes have openings at their proximal ends) the term should not be interpreted as a means-plus-function element.

2.      Other claims:  Claims 6 and 7 of the '856 patent make clear that the "means … for accessing" is simply an opening at the proximal end of the Y-fitting.  For example, claim 6 refers to the identical element in the following manner:  "the proximal end of the catheter having *an opening for accessing the inflation lumen*."  (Exh. D at Col. 7, lines 25-26; emphasis added.)

3.      Prosecution:  As was made clear by Examiner Thaler during his rejection of the claims in view of the Simpson patent, "the proximal end of the catheter shaft is at the extreme left end of the

36

catheter as seen in Fig. 3." (Exh. C5 at 2-3.) Clearly, "the extreme left end of the catheter" is the proximal end of the Y-fitting.

**U.S. Patent No. 4,323,071 to Simpson et al. - Fig. 3**



Proximal end of the catheter shaft

Y - fitting

The claims rejected in view of Simpson included the term at issue here: "means at the proximal end of the catheter for accessing the guidewire and inflation lumens." Notably, the Simpson reference does not disclose "proximal tubes" connected to the Y-fitting. Instead, Simpson only discloses openings at the proximal end of the Y-fitting to access the lumens (as can be seen in Figure 3 above). Thus, Examiner Thaler did not consider "proximal tubes" to be required in the "means … for accessing" element. Openings at the proximal end of the Y-fitting met the element. Importantly, the applicant *never* argued that Simpson lacked a "means … for accessing." Surely such a distinction – if correct – would have been advisable. The examiner rejected the claims in view of Simpson over the course of several years, causing the applicant to appeal to the Board of Patent Appeals and Interferences. But no such distinction was argued because the "means … for accessing" does not include "proximal tubes."

Thus, Examiner Thaler made clear that (1) the "proximal end" of the catheter was the proximal end of the Y-fitting, and (2) a device need not include "proximal tubes" to come within the scope of the

37

"means … for accessing."  Accordingly, the prosecution history confirms that "means at the proximal end of the catheter for accessing" was understood by both the examiner and the applicant to simply be openings at the proximal end of the Y-fitting.

**F.    "at least one aperture associated with the outer tube to facilitate inflation and deflation of the balloon"**

| Medtronic | Kyphon |
|---|---|
| At least one opening associated with the outer tube to allow for inflation and deflation of the balloon. | At least one opening in either the wall of the outer tube or a structure associated with the outer tube to allow for inflation and deflation of the balloon. |

Medtronic merely asks that the Court construe this phrase in its clear and ordinary meaning.  Again, Kyphon adds limitations to the clear and ordinary meaning of the claim.  The claimed aperture is not limited to being on the wall of the outer tube.

1.    <u>Claim language</u>:  There is nothing in the claim language that requires the "aperture" (opening) to be in a specific location.  To be "associated with" the outer tube is merely to be part of the outer tube, whether at is distal end, on its wall, or somewhere else.

2.    <u>It is improper to read limitations into the claims</u>:  Kyphon seeks to impermissibly read in a limitation into the clear claim language.  The claims say nothing about the wall of the outer tube, and it is impermissible to add such language to the claim.  *See*, *e.g.*, *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999).

**VI.    <u>CONCLUSION</u>**

The claim terms at issue in this case are clear from the claim language itself.  According to well settled precedent, each term should be given its plain and ordinary meaning in the context of the intrinsic evidence.  Kyphon's attempt to import non-existent limitations should be rejected.  Fairness and justice require the construction of the terms in accordance with Medtronic's proposed interpretations.

Dated: March 12, 2007

AKIN GUMP STRAUSS HAUER & FELD LLP


By: _____/s/_____
Sean P. DeBruine
Attorney for Plaintiffs
MEDTRONIC, INC.,
MEDTRONIC VASCULAR, INC.,
MEDTRONIC USA, INC.,
MEDTRONIC VASCULAR GALWAY, LTD.,
MEDTRONIC SOFAMOR DANEK, INC., and
SDGI HOLDINGS, INC.

1

2

## CERTIFICATE OF SERVICE

This is to certify that on March 12, 2007, I caused a true and correct copy of the foregoing PLAINTIFFS' OPENING *MARKMAN* BRIEF to be served on Kyphon Inc. by electronic mail and U.S. Mail to the following individuals at the addresses listed:

| | |
|---|---|
| Frank E. Scherkenbach<br>Fish & Richardson P.C.<br>225 Franklin Street<br>Boston, MA 02110-2804<br>Telephone: (617) 521-7883<br>Facsimile: (617) 542-8906<br>scherkenbach@fr.com | Karen I. Boyd<br>Fish & Richardson P.C.<br>500 Arguello Street, Suite 500<br>Redwood City, CA 94063<br>Telephone: (650) 839-5070<br>Facsimile: (650) 839-5071<br>boyd@fr.com |
| Thomas S. McClenahan<br>Katherine A. Moerke<br>Michael J. Kane<br>William R. Woodford<br>Fish & Richardson P.C.<br>3300 Dain Rauscher Plaza<br>60 South Sixth Street<br>Minneapolis, MN 55402<br>Telephone: (612) 335-5070<br>Facsimile: (612) 288-9696<br>mcclenahan@fr.com<br>moerke@fr.com<br>michael.kane@fr.com<br>woodford@fr.com | Thomas L. Halkowski<br>Fish & Richardson P.C.<br>919 N. Market Street, Suite 1100<br>P.O. Box 1114<br>Wilmington, DE 19899-1114<br>Telephone: (302) 652-5070<br>Facsimile: (302) 652-0607<br>halkowski@fr.com<br><br>Glen G. Reid, Jr.<br>Wyatt, Tarrant & Combs L.L.P.<br>The Renaissance Center<br>1715 Aaron Brenner Drive, Suite 800<br>Memphis, TN 38120-4367<br>Telephone: (901) 537 - 4367<br>Facsimile: (901) 537 - 1000<br>GREID@wyattfirm.com |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## APPENDIX

A.   **The '173 Patent**

 1.   **Claim 1**

A balloon catheter comprising:

an inner tubular member having a proximal end, a distal end, and a lumen extending therethrough;

an outer sheath having a proximal end and a distal end, said sheath being disposed coaxially over the inner tubular member to define an inflation lumen therebetween; and

an elastomeric balloon attached to the distal ends of the inner tubular member and the outer sheath to receive inflation medium from the inflation lumen, wherein the balloon is inflatable to a spherical shape having a diameter from 4 mm to 14 mm.

 2.   **Claim 4**

A balloon catheter as in claim 1, wherein the inner tubular member has an outer diameter in the range from 0.33 mm to 4 mm.

 3.   **Claim 5**

A balloon catheter for insertion into a body lumen, said catheter comprising:

an inner tubular member having a proximal end, a distal end, and a lumen extending therethrough;

an outer sheath having a proximal end and a distal end, said sheath being disposed coaxially over the inner tubular member to define an inflation lumen therebetween; and

an elastomeric balloon attached to the distal ends of the inner tubular member and the outer sheath, said balloon being selectively expandable to a spherical size which can partially or totally occlude the particular body lumen.

1  B.    **The '349 patent**

2      1.    **Claim 1**

3          A dilatation catheter comprising:

4          an elongated flexible shaft having a proximal segment and a distal
5          segment, the distal segment of the shaft being smaller in diameter than
           the proximal segment of the shaft;

6          the proximal segment having an inflation lumen extending therethrough;

7          a sleeve extending over the distal segment of the shaft, the proximal end
8          of the sleeve being attached to the shaft and being in communication
           with the inflation lumen;

9
10         the distal end of the sleeve being attached to the distal end of the shaft;

11         the sleeve having an integral enlarged diameter balloon portion, both the
           balloon and the sleeve being formed from a thin walled, flexible material
12         and being inflatable and deflatable, both the sleeve and balloon being
           collapsible about the shaft in response to a negative pressure applied to
13         the inflation lumen,

14         whereby the diameter of the catheter in the region of the sleeve may be
15         made to conform closely to the smaller reduced diameter of the distal
           segment of the shaft.

16      2.    **Claim 4**

17         A dilatation catheter as defined in claim 1 wherein the sleeve and the
18         balloon are formed from a single unitary piece of polymeric material.

19      3.    **Claim 5**

20         A dilatation catheter as defined in any of claims 1 to 4 wherein the
21         proximal segment extends over most of the length of the dilatation
           catheter and the distal segment extending over a relatively short portion
22         of the overall length of the catheter.

23

24

25

26

27

28

C.      **The '191 Patent**

1.      **Claim 1**

A two tube, two lumen coaxial balloon dilatation catheter comprising:

an elongate, flexible catheter shaft having a proximal region, a proximal end and a distal end, wherein the shaft is formed from an inner tube defining a guidewire lumen therethrough, and a surrounding outer tube coaxial with the inner tube and defining an annular inflation lumen therebetween, the inner tube being of smaller diameter than the outer tube and having a distal end region extending distally of the distal end of the outer tube;

an inflatable dilatation balloon having a proximal end and a distal end, the proximal end of the balloon being attached to the distal region of the outer tube, the distal end of the balloon being attached to the distal region of the inner tube at a distal connection;

the outer tube being attached to the inner tube at a location between the proximal region of the catheter shaft and said distal connection to resist axial telescoping of the inner tube with respect to the outer tube when the catheter is advanced against a resistance at the distal region of the catheter, the outer tube terminating proximally of said distal connection;

means for communicating the annular inflation lumen with the interior of the balloon to facilitate inflation and deflation of the balloon, the inflation lumen comprising the sole lumen in communication with the interior of the balloon; and

means at the proximal end of the catheter for accessing each of the guidewire and inflation lumens.

D.     **The '856 Patent**

     1.     **Claim 9**

A balloon dilatation catheter comprising:

an elongate, flexible catheter shaft including a two tube, two lumen configuration, the shaft having a proximal region, a proximal end, and a distal end, wherein the two tube, two lumen configuration includes an inner tube defining a guidewire lumen therethrough, and a surrounding outer tube defining an annular inflation lumen therebetween, the inner tube being of smaller diameter than the outer tube and having a distal end region extending distally of a distal end of the outer tube;

an inflatable dilatation balloon having a proximal end and a distal end, the proximal end of the balloon being attached to the outer tube adjacent the distal end of the outer tube, the distal end of the balloon being attached to the distal end region of the inner tube at a distal connection;

the outer tube being attached to the inner tube at a location between a proximal end of the two tube, two lumen configuration and said distal connection to resist axial telescoping of the inner tube with respect to the outer tube when the catheter is advanced against a resistance encountered adjacent to the distal end of the catheter, wherein the outer tube and the inner tube are unattached for a portion of the two tube, two lumen configuration between the proximal end of the two tube, two lumen configuration and said location, the outer tube terminating proximally of said distal connection;

means for communicating the annular inflation lumen with an interior of the balloon to facilitate inflation and deflation of the balloon, the inflation lumen comprising the sole lumen in communication with the interior of the balloon; and

means at the proximal end of the catheter for accessing the inflation lumen.